317 Ga. 398
FINAL COPY

S23A0429. RIVERA v. THE STATE.

LaGrua, Justice.

On May 19, 1996, the body of Bridgett Parker was discovered near an abandoned mobile home in Ben Hill County. Parker's throat had been cut, and she had been raped. Soon after, law enforcement officers identified Appellant Octavious Rivera as a possible suspect in the crimes against Parker, and over the next few weeks, they interviewed Rivera regarding Parker's death, executed a search warrant for his car and residence, and obtained a sample of his DNA; however, they did not arrest Rivera at that time. In February 2018, following the GBI's reexamination of Parker's sexual assault kit using new DNA testing methods and technology, Rivera's DNA was identified as a match for DNA found inside Parker's vaginal area, and he was arrested. Rivera was later convicted of felony murder predicated on aggravated assault, as well as rape.[1] On appeal,

_____

[1] In April 2018, Rivera was indicted by a Ben Hill County grand jury on

Rivera contends that the trial court erred in the following respects: (1) by denying Rivera's motion for directed verdict on the ground that the State failed to allege the applicable tolling provision or exception to the statute of limitation with respect to Count 3 (aggravated assault) and Count 4 (rape) in the indictment, and on the ground that the statute of limitation on those counts was not tolled; and (2) by permitting the State to admit other-acts evidence under OCGA § 24-4-404 (b) and OCGA § 24-4-413 at trial. For the reasons that follow, we affirm Rivera's felony murder conviction and reverse his rape conviction.

The evidence presented at Rivera's 2019 trial showed that, in the early morning hours of May 19, 1996, Gloria Edmonson and Lee

_____

charges of malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), aggravated assault (Count 3), and rape (Count 4). In June 2019, a jury found Rivera guilty of all counts except malice murder. The trial court sentenced Rivera to serve life in prison with the possibility of parole on the felony murder count and a consecutive sentence of life in prison with the possibility of parole on the rape count. The aggravated assault count merged with the felony murder count for sentencing purposes. On July 25, 2019, Rivera filed a timely motion for new trial. After Rivera waived a hearing on the motion for new trial, the trial court summarily denied Rivera's motion for new trial on April 18, 2022. Rivera filed a timely notice of appeal to this Court on April 28, 2022, and the case was docketed to the April 2023 term of this Court and submitted for a decision on the briefs.

2

Colson discovered Parker's body outside an abandoned mobile home on property owned by Edmonson's father in Ben Hill County. After Edmonson and Colson reported Parker's death, law enforcement officers with the Ben Hill County Sheriff's Department and the GBI responded to the scene.

One of the responding officers, GBI Special Agent Bruce Willis, located Parker's body about 30 feet from the abandoned mobile home and noted she had a significant wound in her neck. According to Agent Willis, between the mobile home and Parker's body, there were four large bloodstains on the ground, as well as "[a] very significant amount of blood" on and around the body, including blood spatter on Parker's shoes. Agent Willis also noted that Parker's body had post-mortem injuries caused by animal and insect activity and a loss of pigment coloration. Agent Willis concluded that, given the animal and insect activity and the decomposition to the body, Parker's body had been in that location about "24 to 36 hours."

The medical examiner determined that Parker's cause of death was "sharp force injuries to the neck." According to the medical

3

examiner, Parker had a "stab slash type of wound," where a "sharp instrument" was "stabbed in th[e neck] area" and then "drawn back down." The medical examiner explained that, because Parker was very petite — with a height of 5′3″ and weight of 98 pounds — the wound was "deep enough to cause injury to some of the arteries that go to the right side of the face," including the "external carotid artery, the right lingual artery, and the right facial artery." The medical examiner observed that all three of these arteries were "incised, causing massive amounts of bleeding."

The medical examiner also observed "deep bruising" on Parker's "anterior vaginal wall" and "significant hemorrhage or bleeding" to the "neck of the bladder" and "right peripelvic tissues" from blunt force trauma caused by a "very forceful penetration." The medical examiner did not see any lacerations in the vaginal area, which suggested to him that Parker was penetrated with a penis, as opposed to another device or object. The medical examiner also conducted a rape kit and collected vaginal swabs and smears from Parker. The medical examiner found no spermatozoa on the vaginal

swabs and smears, which was not unusual given the position of the body and the amount of decomposition caused by the exposure to heat, humidity, and animal and insect activity over the course of about two days.

Over the next few days, law enforcement officers interviewed several witnesses who established that the last time anyone saw Parker before her death was on the night of Friday, May 17, 1996, two days prior to the date her body was found. Edmonson, who was close friends with Parker, told law enforcement officers that she and Parker attended a viewing at a funeral home together between 7:30 and 8:00 p.m. on May 17, and that they then went their separate ways. According to Earnestine Balom, she gave Parker a ride to a nightclub in downtown Fitzgerald later that same evening, and Ethel Wilcox said that she saw Parker leaving this nightclub alone and "on foot" around 9:30 p.m. Balom also told law enforcement officers that, after she dropped Parker off at the nightclub, she had difficulty exiting the nightclub's parking lot because a "long and old car" had parked in front of the nightclub and was blocking part of

5

the driveway. Each woman stated that she did not see Parker alive again.

While investigating Parker's death, law enforcement officers in Ben Hill County received information from law enforcement officers in neighboring Irwin County about a man — later identified as Rivera — who had been involved in two incidents in Irwin County on May 8, 1996 (the "Irwin County incidents"), a little more than a week before the crimes against Parker were committed. One of the victims in the Irwin County incidents told law enforcement officers that the man involved in those incidents was driving a beige Mercury Grand Marquis, and another victim reported to law enforcement officers that the man was driving a "tan-brown looking car" with four doors. During the investigation of the crimes against Parker, Ben Hill County law enforcement officers learned that Rivera, who lived in Ben Hill County, owned a beige 1985 Mercury Grand Marquis. Law enforcement officers then spoke to Balom again — the woman who dropped Parker off at the nightclub on the night of May 17 — and showed her a picture of Rivera's Mercury

Grand Marquis. According to Balom, the car in the photograph "looked like" the car that was partially blocking her exit from the nightclub's parking lot on the night of May 17.

GBI Special Agent Cary Hames interviewed Rivera on May 23, 1996 at the Ben Hill County Sheriff's Department. After advising Rivera of his *Miranda* rights,[2] which Rivera agreed to waive, Agent Hames asked Rivera to provide some personal details, including whether he knew the victim, Parker. Rivera told Agent Hames that he had moved to the area about one year before from New York City and that he had met Edmonson about one month prior, but that he had never met and did not know Parker. When asked about his activities and whereabouts between May 17 and 19, Rivera told Agent Hames that the only time he left his residence during that period was on Saturday, May 18, between 12:00 p.m. and 1:00 p.m., to go to the grocery store to "buy supplies for a cookout."

On June 3, GBI Special Agent Stephen Tinsley, the primary case agent assigned to this case, interviewed Rivera at the

---

[2] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

Fitzgerald Police Department. During this interview, Rivera also told Agent Tinsley that he had moved from New York about one year before "because he wanted a better life for his children." Rivera indicated that he had held several jobs over the past year, including working for Edmonson Logging Company — a company owned by Edmonson's father, Johnny Edmonson. When Agent Tinsley asked Rivera if he knew Parker, Rivera changed his earlier statement and said that he had "met [Parker] a short time earlier through Edmonson," who was "their mutual friend." Rivera said he heard Parker had been killed and that he was familiar with the area where her body was discovered because he had previously "collect[ed] a paycheck" from Johnny Edmonson at the mobile home located on that property. Rivera stated that he did not have any relationship with Parker and that he had only been around her at a nightclub or bar when Edmonson was also present. Agent Tinsley inquired about Rivera's whereabouts during the timeframe leading up to Parker's death, and Rivera told Agent Tinsley that he stayed home all day Friday, May 17, and Saturday, May 18, except for leaving briefly on

May 18 to pick up charcoal at the grocery store for a barbecue.

On June 5, Agent Tinsley obtained a search warrant[3] for Rivera's Mercury Grand Marquis, his residence, and his person based on Balom's statement that Rivera's car looked similar to the one she saw parked at the nightclub where Parker was last seen on May 17. Agent Tinsley and Agent Willis executed the search warrant at Rivera's residence on June 6. The agents seized a pair of boots from the residence because Agent Tinsley observed "what appeared to be [ ] some kind on fluid on [them] such as possible blood or semen"; however, subsequent testing of the boots by the GBI was negative for the presence of blood or spermatozoa. Agent Willis also collected fingerprints from the interior and exterior of Rivera's car and removed the floor mats for testing. The testing revealed that all of the fingerprints in the car belonged to Rivera, and the floor mats were negative for the presence of any blood, saliva, or spermatozoa. When Agent Willis searched the trunk of Rivera's car, he found "cleaning supplies" — specifically, laundry detergent and Clorox —

_____

[3] The search warrants do not appear in the record of this case.

as well as a laundry bag full of clothes, wire, and duct tape. However, law enforcement officers did not find any evidence demonstrating that wire or duct tape had been utilized in the commission of the crimes against Parker. Agent Willis also compared plaster tire casts he had taken of tire tracks located at the crime scene with the tires on Rivera's car, and he noted that the tire impressions from Rivera's car "were visibly consistent with what he saw at the scene." At the conclusion of the search, Agent Tinsley transported Rivera to the hospital, where Rivera consented to having his blood drawn and samples taken of his hair and saliva. These samples were then collected and sent to the GBI crime lab for analysis.

Lynn Langford, a scientist who worked in the Division of Forensic Sciences for the GBI and testified as an expert in forensic DNA analysis at trial, ran tests on Rivera's blood sample, Parker's fingernail clippings, and grass collected from the crime scene, among other items. According to Langford, based on the DNA testing available at that time, no DNA — other than Parker's — was discovered on any evidence collected from Parker's person or from

the crime scene.

At this point, law enforcement lacked probable cause to arrest anyone for the crimes against Parker or any further leads to pursue, and the investigation went into inactive status. All of the evidence collected in this case, including Parker's vaginal swabs and Rivera's bloodstain card, were then sealed and maintained in the GBI crime lab or in lockers at the Ben Hill County Sheriff's Department.

Eighteen years later, in December 2014, GBI Agent Logan Holland was assigned to Parker's murder case to reopen the investigation. As part of the investigation, Agent Holland resubmitted Parker's sexual assault kit to the GBI crime lab for testing, and he interviewed several witnesses again, including Edmonson, who told Agent Holland that she knew Rivera in 1996 because they used to work together at a packing company, but she did not know anything about his potential involvement in the crimes against Parker.

Erin Norris, a forensic biologist with the GBI who testified as an expert in forensic DNA analysis at trial, received the sexual

11

assault kit collected from Parker and Rivera's "bloodstain card" from Agent Holland for testing. Norris explained that DNA testing had advanced significantly since 1996, and she was able to use the vaginal swabs from Parker to obtain a DNA profile for comparison to the DNA profile she obtained from Rivera's bloodstain card. Based on her testing and analysis, Norris concluded that the DNA profile on Parker's vaginal swabs was a match to Rivera.

Based on the results of the DNA testing, Agent Holland started searching for Rivera. After Agent Holland was able to locate a contact number for Rivera, he called Rivera on February 1, 2018, and arranged to meet with him in Tifton. Prior to meeting with Rivera, Agent Holland obtained an arrest warrant for Rivera. On the afternoon of February 1, Agent Holland met with Rivera at Rivera's workplace. Prior to interviewing Rivera, Agent Holland advised Rivera of his *Miranda* rights, which Rivera agreed to waive. During the interview, which was audio-recorded, Rivera initially told Agent Holland that Parker's name did "not sound familiar at all." A few minutes later, Rivera said that he remembered getting a

phone call from law enforcement officers about a week after Parker's death, advising that Parker was dead and that they wanted to talk to him. Rivera said he went to "the station," but he told the officers that he "didn't know anything else about it." Agent Holland showed Rivera a picture of Parker, and Rivera said that he did not recognize her and that, if he knew her, he did not remember her or think he ever had a sexual relationship with her. Rivera recalled that Parker had been murdered, but stated that he did not know how she was killed or any of the details about her murder. Rivera was arrested at the conclusion of this interview.

At trial, the State was permitted to present evidence from several witnesses regarding the Irwin County incidents addressed above under OCGA § 24-4-404 (b) ("Rule 404 (b)").[4] The State presented this evidence for purposes of showing Rivera's intent to commit an aggravated assault against Parker with an unknown

---

[4] The admission of this other-acts evidence forms the basis of one of Rivera's enumerations of error on appeal, which will be discussed in more detail in Division 3 below.

object resulting in serious bodily injury; preparation for committing the charged offenses; plan to commit a series of similar crimes; and motive.

The first Irwin County incident was presented through the testimony of the victim, Deidre Gamble. Gamble testified that, on May 8, 1996, when she was 13 years old, she was walking to her grandmother's house when a "tan-brown looking car" with four doors passed her and pulled over on the side of the road. According to Gamble, a man got out of the car holding a hammer and told her to "come here." Gamble testified that she was terrified, and she "took off running" up the street. The man chased her, but Gamble was able to get away and ran to her grandmother's house. A short time later, Gamble's grandmother took Gamble to the police station to report the incident, and she described the vehicle that stopped and the man who approached her that afternoon. At trial, Gamble identified Rivera as the man who chased her on May 8, 1996.

The second Irwin County incident was presented through the testimony of the victims, Tammy Bargaineer and Shamia Tucker,

14

and an eyewitness, Halique Jordan. Bargaineer testified that, on the evening of May 8, 1996, she and Tucker were walking to an arcade in Ocilla when they observed a beige Mercury Grand Marquis drive down the street and stop in the middle of the road. According to Bargaineer, a man jumped out of the Grand Marquis and grabbed Bargaineer's arm with one of his hands, while he was holding an object in his other hand. Bargaineer did not see the object well, but she remembered it had a silver top on it. Bargaineer snatched her arm away and started running. Tucker, who was 16 years old at the time, testified that the man then grabbed her and "tried to take [her] to the car." She said that she was "fighting him off," and he "hit [her] across the head" and "busted [her] head open." According to Tucker, a woman who was driving by stopped her car and offered to help. Tucker testified that, while she was trying to get into the woman's car, the man was trying to prevent her from doing so, and she wrestled out of her shirt to get away from him. Tucker was able to get into the woman's car, but the man reached in and started choking the woman. Tucker then noticed that her friend, Jordan,

had stopped his car nearby. Jordan testified that, as he was driving down the street, he saw a man pulling on Tucker and "beating her," so Jordan stopped to help. Tucker got into the back seat of Jordan's car, and Jordan drove Tucker to the police station, where she described the person who attacked her and the vehicle he was driving. Tucker was later transported to the hospital, where she received treatment and stitches for her head injury. At trial, Bargaineer, Tucker, and Jordan identified Rivera as the man who assaulted Tucker on May 8, 1996.

1. On appeal, Rivera contends that the trial court erred in denying his motion for directed verdict because the State failed to assert an applicable tolling provision or exception to the statute of limitation in the aggravated assault and rape counts of the indictment to show that these offenses were not time-barred. We conclude that, with respect to the rape count, the trial court erred in denying Rivera's motion for directed verdict, and with respect to the aggravated assault count, the statute of limitation is not at issue because that count merged for sentencing purposes with the felony

16

murder count, for which there is no statute of limitation. See *Lewis v. State*, 306 Ga. 455, 462 (4) (831 SE2d 771) (2019) (concluding that the appellant's "challenge to the aggravated assault conviction [wa]s moot because that count" had merged with the felony murder count).

(a) The State argues on appeal that, because Rivera raised his challenge to the indictment for the first time in a motion for directed verdict of acquittal — as opposed to a demurrer or plea in bar prior to trial — this enumeration of error was not properly preserved for appellate review by this Court. While we agree with the State that challenges to the form of an indictment must be raised before trial or they are waived, challenges to the substance of an indictment can be raised at any time before, during, or after trial. See *Gilmore v. State*, 118 Ga. 299, 299 (1) (45 SE 226) (1903) (holding that a challenge to the substance of an indictment, where the "indictment or accusation is so defective that judgment upon it would be arrested," can be raised at any time during trial). Thus, as explained in more detail below, Rivera has not waived this claim on appeal.

"An indictment may be challenged by general or special

demurrer." *Kimbrough v. State*, 300 Ga. 878, 880 (2) (799 SE2d 229) (2017). "A general demurrer challenges the sufficiency of the substance of the indictment, whereas a special demurrer challenges the sufficiency of the form of the indictment." *Green v. State*, 292 Ga. 451, 452 (738 SE2d 582) (2013) (citing *Bramblett v. State*, 239 Ga. 336, 337-338 (1) (236 SE2d 580) (1977) (punctuation omitted)). "[A] plea in bar is [also a] proper procedural vehicle through which to assert" a challenge to the form or substance of an indictment. *State v. Barker*, 277 Ga. App. 84, 87 (3) (625 SE2d 500) (2005).

"Special demurrers," which challenge the form of the indictment, must be "made at or before arraignment" or before trial or they "are waived." *Bramblett*, 239 Ga. at 337 (1). See also *Taylor v. State*, 303 Ga. 583, 587 (4) (814 SE2d 302) (2018). Similarly, general demurrers, which challenge the substance of the indictment, can be made before trial, but they are not required to be raised at that time. "A challenge to the sufficiency of the substance of the indictment can be made after trial by means of a motion in arrest of judgment," *Bramblett*, 239 Ga. at 338 (1), or "attention may be called

18

to [such a] defect *at any time during the trial." Gilmore*, 118 Ga. at 299 (1) (emphasis supplied). See also, e.g., *Scandrett v. State*, 124 Ga. 141, 142 (2) (52 SE 160) (1905) (holding that challenges to the substance of the indictment can be made "by motion in arrest of judgment") (citation and punctuation omitted); *McKay v. State*, 234 Ga. App. 556, 559 (2) (507 SE2d 484) (1998) (holding that "because a general demurrer attacks the legality of an indictment, it is permissible to raise this ground" before or during trial or "after verdict by a motion in arrest of judgment even if there was no earlier objection") (citation and punctuation omitted).

Where, as here, a defendant challenges an indictment based on the State's failure to assert a tolling provision or exception to the statute of limitation therein, this is a challenge to the substance of the indictment. See *Lynch v. State*, 346 Ga. App. 849, 866-867 (815 SE2d 340) (2018) (McMillian, J., concurring specially). Thus, Rivera was permitted to raise this challenge to the substance of the indictment for the first time in a motion for directed verdict at trial — a motion which, under these circumstances, substantively

19

amounts to a general demurrer that can be raised at any time. See, e.g., *Gilmore*, 118 Ga. at 299 (1); *State v. Mondor*, 306 Ga. 338, 340 (1) (830 SE2d 206) (2019) ("Magic words are not required to file a demurrer, and the substance and function of a motion or pleading generally controls our review."); *Gulledge v. State*, 276 Ga. 740, 741 (583 SE2d 862) (2003) ("[T]here is no magic in nomenclature and . . . substance controls our consideration of pleadings."); *Moss v. State*, 220 Ga. App. 150, 151 (469 SE2d 325) (1996) (holding that the trial court erred in denying the defendant's motion for directed verdict when no exception to the statute of limitation was alleged in the indictment). Therefore, Rivera did not waive this argument, and we may address it on appeal.

(b) "In criminal cases, the statute of limitation runs from the time of the criminal act to the time of the indictment." *Taylor v. State*, 306 Ga. 277, 286 (3) (b) (830 SE2d 90) (2019) (citation and punctuation omitted). "Where an exception is relied upon to prevent the bar of the statute of limitation, it must be alleged and proved." Id. (citing *Hollingsworth v. State*, 7 Ga. App. 16, 16 (1) (65 SE 1077)

(1909) (punctuation omitted)). To that end, "[t]his Court has held that an exception to the statute of limitation is a 'material allegation' which must be alleged in the indictment." Id. (quoting *McLane v. State*, 4 Ga. 335, 342 (2) (1848) (holding that the State is required to allege in the indictment "the particular exception" which the State "intended to [ ] prove[ ] at trial")). See also, e.g., *Jenkins v. State*, 278 Ga. 598, 604 (1) (B) (604 SE2d 789) (2004) ("[I]t is true that an exception to the statute of limitations must be pled in the indictment if the State is relying on one."); *Hansford v. State*, 54 Ga. 55, 58 (3) (1875) (holding that "if the offense appears on the face of the indictment to be barred by the statute of limitation[ ] in reference thereto, and some exception in the statute is relied on to prevent its bar, such exception should be alleged in the indictment").

More than a century ago, this Court explained that

[o]n the score of principle, we think it was incumbent on the prosecuting officer, to have alleged in the indictment the particular exception on which he relied to prevent the operation of the Statute, so that it might affirmatively appear that the defendant was liable under the law, to be arrested, tried and convicted for the offence; and for the further reason, that he might be prepared at the trial, to

21

> traverse all the material allegations made by the State against him.

*McLane*, 4 Ga. at 342 (2). And, since that time, the Court of Appeals

> has made it clear that fundamental principles of due process require indictments or other charging instruments to not only show that a public law of the State has been violated, but also that the defendant has been indicted therefor, in the manner, and within the time, prescribed by the laws of the land.

*Lynch*, 346 Ga. App. at 866 (McMillian, J., concurring specially) (citing *McLane*, 4 Ga. at 340 (2); punctuation and emphasis omitted). "Thus, if an accused is tried on an indictment that is untimely on its face and no exception or tolling provision is alleged, the State cannot introduce evidence of the exception at trial, and any prosecution under that indictment will not be sustained, even if an accused has been tried and convicted thereon." Id. See also, e.g., *Moss*, 220 Ga. App. at 151 (holding that, because "no exception was alleged in the indictment, the State was incapable of proving an exception to toll the applicable four-year statute of limitation, as such proof was inadmissible"); *Hollingsworth*, 7 Ga. App. at 19 (holding that "the evidence that the offense was not barred by the statute of limitations

22

was inadmissible, unless it was pleaded in the [indictment]").

Here, it is undisputed that the State did not allege an applicable tolling provision or exception to the statute of limitation in the rape count of the indictment as the law required it to do. And, "because the indictment did not include the required language to show that the statute of limitation period[ ] had been tolled, the indictment was fatally defective as a matter of law" as to the rape count, and Rivera's "conviction[ ] on th[at] count[ ] must be reversed." *Lynch*, 346 Ga. App. at 856 (3) (a) (i).

2. Rivera next contends that the trial court erred in denying his motion for directed verdict because his aggravated assault and rape charges were indicted outside the applicable four- and fifteen-year statutes of limitation, and the State failed to prove at trial that the statutes of limitation were tolled by the person-unknown exception in OCGA § 17-3-2 (2)[5] or the DNA exception in OCGA §

____

[5] OCGA § 17-3-2 (2) provides that "[t]he period within which a prosecution must be commenced under Code Section 17-3-1 or other applicable statute does not include any period in which: . . . The person committing the crime is unknown or the crime is unknown[.]"

23

17-3-1 (d) (3).[6] However, given our conclusion that the rape count must be reversed because the State failed to allege the applicable tolling provision or exception to the statute of limitation in the indictment and because the challenge to the aggravated assault count is moot, we need not reach the merits of this argument on appeal.

3. Finally, Rivera contends that the trial court erred in permitting the State to admit evidence of the Irwin County incidents under Rule 404 (b) because these incidents were irrelevant to any issue other than Rivera's character and because the probative value of this other-acts evidence was substantially outweighed by the danger of unfair prejudice. Rivera also contends that the trial court

---

[6] OCGA § 17-3-1 (d) provides that
[a] prosecution for the following offenses may be commenced at any time when deoxyribonucleic acid (DNA) evidence is used to establish the identity of the accused: . . . Rape, as defined in Code Section 16-6-1; . . . provided, however, that a sufficient portion of the physical evidence tested for DNA is preserved and available for testing by the accused and provided, further, that if the DNA evidence does not establish the identity of the accused, the limitation on prosecution shall be as provided in subsections (b) and (c) of this Code section.

24

erroneously admitted this evidence under OCGA § 24-4-413[7] ("Rule

413") because there was no evidence of sexual assault in either of

the Irwin County incidents.[8] We conclude that, even if the trial court

---

[7] Rule 413 provides:

(a) In a criminal proceeding in which the accused is accused of an offense of sexual assault, evidence of the accused's commission of another offense of sexual assault shall be admissible and may be considered for its bearing on any matter to which it is relevant.

(b) In a proceeding in which the prosecution intends to offer evidence under this Code section, the prosecutor shall disclose such evidence to the accused, including statements of witnesses or a summary of the substance of any testimony that is expected to be offered, at least ten days in advance of trial, unless the time is shortened or lengthened or pretrial notice is excused by the judge upon good cause shown.

(c) This Code section shall not be the exclusive means to admit or consider evidence described in this Code section.

(d) As used in this Code section, the term "offense of sexual assault" means any conduct or attempt or conspiracy to engage in:

(1) Conduct that would be a violation of Code Section 16-6-1, 16-6-2, 16-6-3, 16-6-5.1, 16-6-22, 16-6-22.1, or 16-6-22.2;

(2) Any crime that involves contact, without consent, between any part of the accused's body or an object and the genitals or anus of another person;

(3) Any crime that involves contact, without consent, between the genitals or anus of the accused and any part of another person's body; or

(4) Any crime that involves deriving sexual pleasure or gratification from the infliction of death, bodily injury, or physical pain on another person.

[8] We note that, while the trial court initially ruled that one of the Irwin County incidents was also admissible under Rule 413 because the court was under the impression that a sexual assault had occurred during the incident since the victim came out of her shirt, the trial court later revised its ruling

abused its discretion in admitting this other-acts evidence at trial, the admission of this evidence was harmless error. See *Tiraboschi v. State*, 312 Ga. 198, 200 (2) (862 SE2d 276) (2021) ("We need not decide whether this evidence was erroneously admitted, because any such error was harmless.").

At trial, the State presented evidence of the Irwin County incidents through several witnesses. Prior to the witnesses' testimony and in the trial court's final charge to the jury, the trial court gave the jury an instruction limiting the jury's use of this evidence. The limiting instruction and final charge instructed the jury that evidence of these two incidents was being "admitted for a limited purpose" and "may be considered by the jury for the sole issue or purpose for which the evidence [was] limited and not for any other purpose." The trial court further instructed that the limited purposes for which this evidence was being admitted by the State was to show "intent," "plan and preparation of the defendant in

---

after testimony was admitted about this incident at trial, stating on the record that Rule 413 did not apply.

committing the offenses," and "motive of the defendant in committing the offenses." The trial court directed the jury that it was "permitted to consider that evidence only in so far as it may relate to those issues and not for any other purpose."

Assuming without deciding that the trial court erroneously admitted the Irwin County incidents for the stated purposes under Rule 404 (b), "evidentiary errors require reversal only if they harm a defendant's substantial rights." *Pritchett v. State*, 314 Ga. 767, 778 (2) (c) (879 SE2d 436) (2022) (citation and punctuation omitted). "The test for determining whether a nonconstitutional evidentiary error was harmless is whether it is highly probable that the error did not contribute to the verdict." *Tiraboschi*, 312 Ga. at 200 (2). In reaching that determination, "we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done," as opposed to "viewing it all in the light most favorable to the jury's verdict." *Edwards v. State*, 308 Ga. 176, 184 (3) (839 SE2d 599) (2020) (citation and punctuation omitted).

"[A]s to the central issue at trial," the evidence of Rivera's guilt

was strong. *Tiraboschi*, 312 Ga. at 200 (2). See also *Edwards*, 308 Ga. at 184 (3). First, there was physical evidence supporting the State's theory that Rivera was the perpetrator of the crimes against Parker. At trial, the medical examiner testified that Parker was raped shortly before her death, and subsequent DNA testing revealed that Rivera's DNA was a match for the DNA found on the vaginal swabs in Parker's rape kit. Additionally, a witness testified at trial that she saw a car that looked like Rivera's car parked at the same nightclub where she dropped Parker off on the evening of May 17, 1996 — the night Parker was last seen alive. And law enforcement discovered tire tracks consistent with the tire impressions from Rivera's car at the crime scene — a location with which Rivera admitted he was familiar, having previously picked up paychecks at this location from his former employer, Johnny Edmonson.

"We recognize that the admission of this other-acts evidence carried a risk of prejudice" to Rivera, particularly since the State did not demonstrate that he was charged with any crimes arising from

the Irwin County incidents and "because the State chose to emphasize" the Irwin County incidents again during closing arguments. *Pritchett*, 314 Ga. at 780 (2) (c). See also *Hood v. State*, 299 Ga. 95, 105 (4) (786 SE2d 648) (2016) (noting that the danger of admitting extrinsic offense evidence is greater where "the extrinsic activity was not the subject of a prior conviction" because "the jury may feel that the defendant should be punished for that activity even if he is not guilty of the offense charged") (citation and punctuation omitted). However, "in light of the substantial evidence" of Rivera's guilt in this case and "after conducting a de novo review and weighing the evidence as reasonable jurors would, we conclude that it is highly probable that [any] error in admitting the other-acts evidence" was harmless and "did not contribute to" the jury's guilty verdicts against Rivera. *Pritchett*, 314 Ga. at 780 (2) (c). See also *Tiraboschi*, 312 Ga. at 201 (2) ("In sum, the jury heard compelling evidence of Appellant's guilt, and it is highly probable that the admission of the evidence relating to his prior convictions did not contribute to the jury's guilty verdict.").

4. Therefore, we affirm Rivera's felony murder conviction, reverse his rape conviction, and remand this case to the trial court for resentencing in accordance with this opinion.

*Judgment affirmed in part and reversed in part, and case remanded. All the Justices concur.*

Decided October 11, 2023.

Murder. Ben Hill Superior Court. Before Judge Hughes.

*Lon P. Kemeness*, for appellant.

*Bradford L. Rigby, District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.