**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: October 25, 2022

S22A1220.  POLKE v. THE STATE.

ELLINGTON, Justice.

A Tattnall County jury found Barbra Ann Polke guilty of malice murder and other crimes arising from the shooting death of her former girlfriend, Ashley Sharpe.[1] Polke contends that the

---

[1] A Tattnall County grand jury indicted Polke on February 24, 2015, for felony murder (Count 1), aggravated assault (Count 2), malice murder (Count 3), possession of a firearm during the commission of a felony (Count 4), and two counts of possession of a firearm by a convicted felon (Counts 5-6), arising from the shooting death of Sharpe on July 11, 2014. After a bifurcated jury trial held on May 23 and 24, 2016, Polke was found guilty on all counts except Count 6. On June 14, 2016, Polke was sentenced as a recidivist to life in prison without parole for malice murder; five years concurrent imprisonment for possession of a firearm by a convicted felon; and five years consecutive imprisonment for possession of a firearm during the commission of a felony. The trial court purportedly merged the remaining counts for purposes of sentencing. Although the aggravated assault count was properly merged, the felony murder count actually stood vacated by operation of law.  See *Johnson v. State*, 300 Ga. 665, 665 n.2 (797 SE2d 903) (2017). Polke filed a motion for a new trial on June 20, 2016, which she amended through new counsel on March 30, 2020. Following a hearing on April 19, 2022, the trial court denied Polke's motion. Polke filed a notice of appeal on May 18, 2022. This appeal was docketed to the August 2022 term of Court on July 7, 2022, and submitted for a decision on the briefs.

evidence was insufficient to support her convictions beyond a reasonable doubt and that the trial court should have exercised its discretion as the thirteenth juror to grant a new trial. Polke also contends that the State failed to prove venue beyond a reasonable doubt. Because the record supports the trial court's order denying Polke's motion for a new trial, we affirm.

In assessing the constitutional sufficiency of the evidence, this Court views the evidence in the "light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." (Citation and punctuation omitted.) *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013). See also *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). So viewed, the evidence shows the following.

Polke and Sharpe were in a romantic relationship, and they lived together and worked together in Vidalia. Sharpe worked for WalMart; Polke worked at a McDonald's franchise located inside the WalMart. According to Polke, the first nine months of their relationship was good, but when she became suspicious that Sharpe

2

was cheating on her, the relationship soured.

On June 29, 2014, Polke punched Sharpe in the face, sending her to the emergency room. Sharpe filed a police report. Sharpe immediately ended the relationship, and Polke moved out of their home. Sharpe considered seeking a restraining order but decided instead to request a transfer to the WalMart in Rincon. Catherine Sharpe ("Catherine"), who has no apparent relation to the victim, let Polke stay with her after the breakup. Text messages between Polke and Sharpe showed that, in the 12 days between the assault and the shooting, Sharpe remained resolute in her decision to end the relationship. Nevertheless, Polke repeatedly asked her for forgiveness. Sharpe responded that she was afraid of Polke and that there was nothing Polke could say or do to repair the relationship.

On the morning of July 10, 2014, the day before the shooting, Sharpe told Polke to stop calling her or she would get a restraining order and quit her job. That same morning, Polke asked her friend Catherine for help. Catherine took Polke to a pawn shop where they pawned several items in exchange for a .380 Jiminez handgun.

3

Thereafter, Catherine and Polke searched for .380 bullets, finally finding a store that carried them. One of the store's employees, an acquaintance of Polke, testified that she saw Polke grabbing boxes, trying to find the right ammunition. When the employee asked why they were looking for bullets, Polke responded with a "shushing" sound, admonishing the employee to be quiet.

On July 11, 2014, Sharpe learned that her transfer request had been approved. She clocked out of work at 1:56 p.m. for lunch. WalMart video surveillance of the parking lot shows Sharpe getting into Polke's car shortly thereafter. About 45 minutes later, Polke called 911 and said that Sharpe had been shot but was still alive. Paramedics and police officers responded to Catherine's home in Reidsville, which is in Tattnall County. Though emergency personnel arrived within minutes of the 911 call, they found Sharpe deceased.

Sharpe was seated in the passenger seat of Polke's car with an apparent gunshot wound to the left side of her head. The paramedics did not believe that Sharpe had died within the previous few

4

minutes, which was contrary to Polke's statements in the 911 call. Sharpe had been shot once, just above her left ear. According to the medical examiner, the bullet passed through her head and exited the right temple. Gunpowder stippling was found near the entry wound. The medical examiner testified that the gun was fired less than 18 inches away from the wound, and "probably much closer."

The police tested Polke's hands for gunpowder residue and recovered enough residue to suggest that she had either fired a weapon, was close to a gun when it was fired, or had handled something that had primer particles on it. The police recovered a .380 shell casing from the back seat of Polke's car. Police officers and forensics experts testified that the passenger window had what appeared to be a bullet hole with shattered glass around the periphery of the hole, but no glass was found inside the car, suggesting that a gun had been fired from inside the car. No other defect similar to the hole in the passenger-side window was found on the interior or exterior of the car.

Initially, Polke told the police that she had picked Sharpe up

5

from work and had taken her to eat lunch at a Chinese restaurant in Lyons. After lunch, they drove to Reidsville. Polke claimed that, when they stopped at the intersection of Highway 280 and Gordon Avenue in Toombs County, she saw a group of men, one of whom fired a shot at her car, striking Sharpe. Polke said that she did not immediately realize that Sharpe had been shot. Instead of driving to a hospital in Vidalia, just five minutes away, Polke said she panicked and drove to Catherine's house in Reidsville. Based on this initial account, the police went to the intersection in Toombs County and immediately secured and searched area. The police took Polke to the intersection, and she indicated where she had seen the group of men. The police found no ballistics evidence there and no one in the area reported hearing gunshots or seeing suspicious activity. In fact, no evidence of any kind was found at the location provided by Polke.

Polke testified at trial and gave a different account of the shooting. At trial, she said that her friend Catherine "was the one who gave [her] that gun to kill [Sharpe]," and that she was sorry

6

because "she didn't want to kill [Sharpe], but [Catherine] told [her] to." She said that Catherine took the gun from her after the shooting and hid it. Polke was a convicted felon at the time of the shooting, as shown by her 2008 Evans County conviction for carrying a concealed weapon.

1. With respect to Polke's first claim of error challenging the sufficiency of the evidence as a matter of constitutional due process under *Jackson*, the record shows that the evidence of Polke's guilt was overwhelming. Polke testified at trial and essentially admitted that she shot Sharpe. The record shows that Sharpe ended her relationship with Polke because of Polke's violent behavior toward her. Polke repeatedly tried to reestablish the relationship, even though Sharpe had threatened to get a restraining order. Polke purchased a .380 handgun and bullets the day prior to the shooting. A .380 shell casing was found in Polke's car after the shooting. The police observed a bullet hole in the passenger-side window, but no glass inside the car, which supported an inference that a gun had been fired from inside the car. The medical examiner testified that

7

Sharpe's death was caused by a wound from a bullet that entered the left side of her head, exited through the right side, and which was fired from a gun no further than 18 inches away. Polke had gunpowder residue on her hands. Polke's initial version of the shooting, that it happened in Toombs County and that a gun was fired by one of several men standing outside the car, was not supported by any evidence. This evidence is sufficient to support the jury's verdicts beyond a reasonable doubt. See *Jackson*, 443 U. S. at 318-319.

2. Polke also contends that the trial court "should have exercised its discretion as the thirteenth juror and granted [her] a new trial." OCGA §§ 5-5-20 and 5-5-21, respectively, allow the trial court to grant a new trial "[i]n any case when a verdict of the jury is found contrary to evidence and the principles of justice and equity," or when "the verdict may be decidedly and strongly against the weight of the evidence even though there may appear to be some slight evidence in favor of the finding." The two statutes give "the trial court broad discretion to sit as a thirteenth juror and weigh the

8

evidence on a motion for new trial alleging these general grounds." *Holmes v. State*, 306 Ga. 524, 527-528 (2) (832 SE2d 392) (2019) (citation and punctuation omitted).

The record does not support Polke's claim of error. Although she sought a new trial on this basis, the argument in the brief supporting her motion for a new trial was cursory at best. In a one-paragraph argument, counsel asserted, based upon testimony presented at sentencing, that Polke was easily manipulated because she had a low IQ. Moreover, Polke's counsel did not advance the thirteenth-juror argument during the hearing on her motion, conceding that Polke had admitted shooting Sharpe. Instead, counsel focused solely on her second claim of error, a venue argument, and informed the trial court that, with respect to the insufficiency claim, she would rely on her written brief in support of the motion.

In its order denying the amended motion for a new trial, the trial court denied "each and every ground thereof" based upon its review of the entire record and counsel's argument at the hearing.

9

Under these circumstances, we cannot say that the trial court abused its discretion as the "thirteenth juror" in denying Polke's motion. See *Smith v. State*, 300 Ga. 532, 534 (1) (796 SE2d 671) (2017).

3. Polke contends that the evidence was insufficient to allow the jury to find that venue was proper in Tattnall County. We disagree.

With respect to venue generally, "all criminal cases shall be tried in the county where the crime was committed." Ga. Const. of 1983, Art. VI, Sec. II, Par. VI. See also OCGA § 17-2-2 (a) ("Criminal actions shall be tried in the county where the crime was committed, except as otherwise provided by law."). Also, "[c]riminal homicide shall be considered as having been committed in the county in which the cause of death was inflicted." OCGA § 17-2-2 (c). If, however, "it cannot be determined in which county the cause of death was inflicted, it shall be considered that it was inflicted in the county in which the death occurred." Id. If a "body is discovered in this state and it cannot be readily determined in what county the cause of

death was inflicted, it shall be considered that the cause of death was inflicted in the county in which the dead body was discovered." Id. See also *Coleman v. State*, 301 Ga. 753, 755 (804 SE2d 89) (2017); *Shelton v. Lee*, 299 Ga. 350, 354-355 (788 SE2d 369) (2016). And, OCGA § 17-2-2 (h) provides that, "[i]f in any case it cannot be determined in what county a crime was committed, it shall be considered to have been committed in any county in which the evidence shows beyond a reasonable doubt that it might have been committed." With respect to proof of venue,

> [v]enue is a jurisdictional fact that the State must prove beyond a reasonable doubt and can do so by direct or circumstantial evidence. Determining whether venue has been established is an issue soundly within the province of the jury. When examining whether the State has carried its burden, we view the evidence in the light most favorable to the verdict and must sustain the verdict if the evidence was sufficient to permit a rational trier of fact to find beyond a reasonable doubt that the crime was committed in the county where the defendant was indicted.

(Citations and punctuation omitted.) *Hernandez v. State*, 304 Ga. 895, 898 (2) (823 SE2d 272) (2019).

The trial court charged the jury that the State must prove

11

venue beyond a reasonable doubt and that where "it cannot be determined in what county the crime was committed, then venue is proper and may be proved in any county in which the evidence shows beyond a reasonable doubt that it might have been committed." See OCGA § 17-2-2 (a) and (h).[2] In this case, it was not readily determinable whether Polke shot Sharpe in Toombs or Tattnall County. Polke initially claimed that the shooting happened in Toombs County; however, there was no evidence to corroborate her account of events, and the jury was authorized to reject her self-serving statement as a lie. It was also unclear where Sharpe died. Polke claimed that Sharpe was still alive when they arrived at Catherine's home in Tattnall County, a statement from which the jury could infer that Sharpe died in Tattnall County. However, there was evidence that the paramedics believed Sharpe's death had occurred earlier than Polke claimed. It was undisputed, however, that Sharpe's body was found in Tattnall County. Thus, the jury was

---

[2] The trial court did not charge the jury that it could find venue pursuant to OCGA § 17-2-2 (c), concerning where the cause of death was inflicted.

12

authorized to find beyond a reasonable doubt that venue was established in Tattnall County under OCGA § 7-2-2 (h). See *Hernandez*, 304 Ga. at 898 (2) (venue lay in county where victim's body was found "because it was not readily determinable where Hernandez shot and killed [the victim]"). See also *Bulloch v. State*, 293 Ga. 179, 187 (4) (744 SE2d 763) (2013) (Evidence was sufficient for the jury to find beyond a reasonable doubt that venue was established pursuant to OCGA § 17-2-2 (a) and (h).).

*Judgment affirmed. All the Justices concur.*