**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: February 6, 2024

S23A1024. VENDREL v. THE STATE.

ELLINGTON, Justice.

Luis Vendrel appeals his convictions for malice murder and possession of a firearm during the commission of a felony in connection with the shooting death of Nova Jill Saffles.[1] Vendrel

---

[1] The crimes occurred on September 26, 2015. On December 7, 2015, an Effingham County grand jury indicted Vendrel for malice murder, three counts of felony murder, two counts of aggravated assault, and one count each of aggravated battery and possession of a firearm during the commission of a felony. After a jury trial that ended on September 16, 2016, Vendrel was found guilty on all counts. On that same day, Vendrel was sentenced to serve life in prison without the possibility of parole for malice murder and a consecutive five-year prison term for the firearms charge. The trial court purported to merge the remaining counts for sentencing purposes, but the felony murder counts actually stood vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 372-373 (4), (5) (434 SE2d 479) (1993); *Polke v. State*, 315 Ga. 33, 33 n.1 (880 SE2d 153) (2022). Vendrel filed a timely motion for new trial, which he amended through new counsel on June 21, 2019. After a hearing on October 30, 2019, the trial court denied the amended motion for new trial on May 26, 2020.

The deadline for filing a notice of appeal, which had been suspended on March 14, 2020, was reimposed as of July 14, 2020. See *Mobuary v. State*, 312 Ga. 337, 339 (862 SE2d 553) (2021) (A "May 8, 2020 order was entered during

contends that he suffered a constructive denial of his right to counsel or otherwise received ineffective assistance of trial counsel. Because Vendrel has failed to carry his burden of proving either contention, we affirm.

The State presented evidence at trial showing that, while they were living together, Vendrel shot Saffles multiple times in the

the period in which nonconstitutional filing deadlines, including filing requirements that were imposed on litigants by statute and court order, were tolled by the Chief Justice's March 14, 2020 Order Declaring Statewide Judicial Emergency in response to the COVID-19 pandemic, as extended in subsequent orders. See OCGA § 38-3-62 (a) (10). Pursuant to the Chief Justice's July 10, 2020 Fourth Order Extending Declaration of Statewide Judicial Emergency, such deadlines were reimposed effective July 14, 2020."). Thus, Vendrel was required to file his notice of appeal by August 13, 2020. See OCGA § 5-6-38 (a) (requiring a notice of appeal to be filed within 30 days after the entry of the order finally disposing of a motion for new trial). However, a notice of appeal was not filed until September 29, 2020, and this Court dismissed the appeal, Case No. S21A1105, as untimely on June 21, 2021. A motion for out-of-time appeal was filed in the trial court on November 8, 2021, and was granted on February 28, 2022, and a second, "out-of-time" notice of appeal was filed on March 9, 2022, but in Case No. S22A0871, on May 3, 2022, this Court vacated the order granting an out-of-time appeal and remanded the case for entry of an order dismissing the motion pursuant to *Cook v. State*, 313 Ga. 471 (870 SE2d 758) (2022).

Vendrel then filed a petition for writ of habeas corpus on the ground that he was entitled to an out-of-time appeal because he was denied his right to a direct appeal through the ineffectiveness of his appellate counsel. On March 14, 2023, the habeas court granted relief and ordered that Vendrel would have the right to file a notice of appeal. Vendrel filed a notice of appeal pursuant to that order, and the case was docketed in this Court to the August 2023 term and submitted for a decision on the briefs.

chest, arm, and face, that he repeatedly confessed to the shooting, and that he changed his story several times. Saffles was still married to another man but had separated from her husband when she and Vendrel began dating and moved into a house together, along with Saffles' adult daughter Sierra Seiler. Vendrel often argued with Saffles. He became upset when she would spend time with her estranged husband, and Vendrel threatened to kill him. On September 26, 2015, Saffles and Seiler were out with Saffles' husband and returned to Vendrel's and Saffles' home that evening. Seiler testified that Vendrel "looked really mad" and "slid his hand under the pillow" on the bed he shared with Saffles, but Seiler did not see anything under the pillow. Seiler left the house to go back out with a friend, and a short time later, a neighbor heard gunshots, saw someone leave the house and drive away in a Geo Tracker vehicle, and called 911.

Vendrel subsequently called his sister, and she called 911 and provided Vendrel's cell phone number to the dispatcher. The dispatcher then called Vendrel, who said that he had a gun, "wanted

to kill himself," had "killed a female," and was "sorry." When officers located Vendrel in a Geo Tracker parked at a friend's residence, Vendrel would not get out of the vehicle at first, saying that "they were going to kill him because he had killed her"; that he "shot her beca[us]e she was married and was cheating on him with her husband and . . . was going to break up with him and go back to her husband"; that "even God could not forgive him for what he did"; and that he "wanted to die because he did not want to go to prison for the rest of his life." When Vendrel finally got out of his vehicle, he was barefooted. The officers arrested him at that time and found a large revolver in the vehicle.

The deputy who transported Vendrel to the county jail testified that Vendrel "spontaneously" told her that Saffles "had contacts in the jail"; said he was "sorry that he shot her"; asked "several times if she was dead"; told the deputy "spontaneously that the reason he shot her was because she was . . . playing with his emotions every Friday and Saturday by telling him that she loved him and was going to leave her husband to be with him"; and several times said

4

that he "killed her and . . . was going to prison for life." Later that night, when GBI agents interviewed Vendrel, he told them that Saffles had been "off somewhere" with her husband and daughter "all day long" when "she was supposed to have come home to him." Vendrel also said that he had shot and killed Saffles with the revolver found in his vehicle and that he had two other guns in his house.

Two days after the shooting, although Vendrel had already been arrested, a GBI agent returned to the jail for the sole purpose of serving an arrest warrant on Vendrel to "complete . . . an arrest record." At that time, Vendrel stated, without being asked any questions, that he had "pointed the gun" at Saffles, that she said "just do it," and that "the gun fired." When the agent returned later to complete an arrest form, Vendrel, again without being questioned, "kind of made a motion that she had put her hands on the gun or something like that and then it just fired." Although English is not Vendrel's first language, he "kept trying to tell [the agent] stuff," and the agent advised Vendrel to talk to his attorney.

About two months later, the same agent again returned to the jail to obtain buccal swabs from Vendrel. During that encounter, Vendrel asked if fingerprints had been lifted from his .380-caliber semi-automatic pistol because "that's the one she used . . . against me. I was defending myself." The agent again advised him to talk with his attorney. Another month later, on a recorded phone call made by Vendrel from the jail, he said that "the first two shots were into her chest and then the shot to the face was the last shot."

Officers had discovered Saffles' body on the kitchen floor of the house where she and Vendrel lived. Blood was on the walls and floor in different rooms of the house, including the kitchen door and the floor near her body. DNA swabs of Vendrel's feet tested positive for Saffles' blood. Officers found, on the passenger seat of Vendrel's vehicle, a Taurus Judge .410-caliber revolver, which can fire shotgun shells as well as bullets. The revolver had a five-shot cylinder with three live Winchester PDX1 rounds, one spent Winchester Super X shotgun shell, and one empty chamber. Bullets and bullet fragments, as well as pellets and wadding from a shotgun

6

shell, were found in various parts of the house, including the kitchen and the bedroom. Five shell casings recovered from Vendrel's and Saffles' bed were Winchester PDX1 rounds that had been fired from the Taurus Judge revolver found in Vendrel's vehicle.

The medical examiner determined that Saffles was shot in her chest and arm, that "multiple gunshot wounds" caused her death, and that a large gunshot wound to the right side of her face likely was inflicted after she was already deceased. The facial wound, from which wadding and pellets were recovered, was consistent with a .410 shotgun shell, while the other wounds were consistent with .410 PDX1 Defender rounds. The Taurus Judge revolver was designed to fire both types of .410-caliber ammunition (as well as .45-caliber Colt ammunition).

At trial, Vendrel presented three defense witnesses before testifying in his own defense. The first defense witness, Scott Shepard, who was Saffles' co-worker and friend, responded to an initial inquiry from Vendrel's trial counsel – "This is the first time you and I have ever met; is that right, sir?" – by testifying "[t]hat is

correct." Shepard described an incident involving Vendrel as follows: the day before Saffles' death, Shepard had waved at her in her car; Vendrel was in the passenger seat and made an insulting gesture towards him; Shepard texted Saffles, who answered that it was Vendrel; Vendrel called Shepard on Saffles' phone and threatened him; and Shepard replied that he would "knock [Vendrel's] teeth out." Shepard further testified that he never had any other incidents with Vendrel; Saffles and Vendrel had arguments with each other that at times "got bad"; Saffles never asked Shepard for help to leave the relationship; and Shepard understood that Vendrel "was jealous that [he] made [Saffles] laugh and that [she and Shepard] had a good working relationship."

The second defense witness, Vendrel's former employer, testified that Vendrel was a "loner" and a "great worker"; he had "never seen [Vendrel] harassing anybody"; he would loan money to Vendrel, who kept his word and "always paid it back"; he had advised Vendrel and Saffles that their romantic relationship was "not healthy" and was "not going to work out" as she was still

8

married; and he was "[v]ery surprised" at the crime because Vendrel "idolized" Saffles. The third defense witness, Vendrel's sister, testified that she was aware of problems in his relationship with Saffles; she counseled Vendrel to leave the relationship because although he loved Saffles, she was a married woman; Vendrel was afraid of Saffles' husband; on the night Saffles was killed, Vendrel called his sister, was "very distraught" and "upset," and told her that he had killed Saffles and was going to kill himself; and she then called 911.

Vendrel testified in his own defense as follows. On the night of her death, Saffles smelled like alcohol, started to argue with him, and became violent. She first picked up the Taurus Judge revolver and "put it in her mouth." Vendrel tried to take it away from Saffles, she aimed it at her face, and he took hold of the gun but "her hand was on the trigger and it went off," striking a wall and possibly injuring her. Saffles then grabbed Vendrel's .380-caliber pistol and aimed it at his face. He feared for his life and "tried to stop her" by firing the revolver at her, hitting her in the chest. Saffles pushed

Vendrel, and he slipped on a rug, fell against a door, and accidentally fired another round that did not injure Saffles. Vendrel tried to get out of the house, but Saffles grabbed and pushed the door he was trying to use and pointed the .380-caliber pistol at him very close to his face. Vendrel then shot Saffles in the middle of her chest, causing her to fall and drop the .380-caliber pistol. Vendrel returned the .380-caliber pistol to its holster, put it under the bed where he kept it, and reloaded the revolver. When Vendrel went past Saffles to leave the house, she was still alive, she reached up and grabbed the revolver, he pulled back, and the gun fired accidentally.

After Vendrel was found guilty on all counts and convicted of malice murder and the firearms charge, he filed a motion for new trial, and at the hearing on that motion, Vendrel's trial counsel testified with respect to his representation as follows. He had practiced law since 1990, and he had a general trial practice that included a "heavy" caseload of misdemeanor cases and some felony cases. He had handled felony jury trials, but this was the first murder case that he tried as lead counsel. The fact that counsel

speaks Spanish, which is Vendrel's first language, facilitated the representation. Counsel reviewed discovery, was aware of ballistics and DNA evidence, and spoke with law enforcement officers who were witnesses for the State. Counsel decided not to request funds to hire a ballistics expert or DNA expert because he and Vendrel understood the evidence, Vendrel's theory at trial was self-defense, and, with or without an expert, counsel could ask the same questions, such as questions pointing out the State's failure to test the firearms involved for fingerprints. Counsel met with Vendrel at the jail "between four and eight" times, spoke with him by phone, and used Vendrel's sister as a "go-between." Counsel took evidence, including audio and video recordings, to the jail and reviewed it with Vendrel. Counsel could not play one disc that he received from the State late one afternoon during the trial (because he did not have the "proper kind of player" with him that evening), but he asked for a recess the next morning so that he could play the disc for Vendrel on a DVD player in a side room at the court. Counsel interviewed and prepared the defense witnesses prior to trial, but nevertheless

11

was at times caught "off guard" by their responses to his questions at trial. Counsel did not specifically identify which individual defense witnesses he interviewed. He discussed the case with Vendrel, considered several issues like Saffles' allegedly "being an alcoholic or drinking" and Vendrel's jealousy, and developed a defense theory with Vendrel, based on his account of the events, that Saffles "grabbed the gun in an argument in the bed that either was attempted suicide by her or by him, and the gun went off," followed by her chasing him around the house. Counsel discussed with Vendrel the conflicts between his testimony and the State's evidence, but Vendrel was "determined to testify." About the evidence from the medical examiner that the gunshot to Saffles' face likely occurred after her death, counsel "figured the jury could say . . . [the] doctor could be a few minutes off."

1. Citing *United States v. Cronic*, 466 U. S. 648, 659 (III) (104 SCt 2039, 80 LE2d 657) (1984), Vendrel first contends that trial counsel failed to subject the State's case to adversarial testing in any meaningful way and that this failure amounted to a constructive

12

denial of Vendrel's right to the assistance of counsel.

To obtain relief based on ineffective assistance of counsel, a defendant generally must show both that his counsel's performance was constitutionally deficient and that this deficient performance prejudiced him. See *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). *Cronic*'s exception to the general *Strickland* standard for a "constructive denial of the assistance of counsel altogether," which is "legally presumed to result in prejudice," id. at 692 (III) (B), is "a narrow one that applies only when there was a breakdown in the adversarial process, such that counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Wainwright v. State*, 305 Ga. 63, 68 (3) (823 SE2d 749) (2019) (citation and punctuation omitted). When the United States Supreme Court "spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, [it] indicated that the attorney's failure must be complete." *Roberts v. State*, 305 Ga. 257, 267 (6) (824 SE2d 326) (2019) (citation and punctuation omitted). Thus, the attorney's

13

failure "must occur throughout the proceeding and not merely at specific points." *Wainwright*, 305 Ga. at 68 (3). Allegations that trial "counsel was ineffective at specific points of [the] trial do not meet this stringent standard." *Burrell v. State*, 301 Ga. 21, 23 (2) (799 SE2dd 181) (2017). See also *Charleston v. State*, 292 Ga. 678, 683 (4) (a) (743 SE2d 1) (2013) (A defendant's "assertion that his trial counsel failed to act as an advocate on several occasions does not meet this stringent standard." (punctuation omitted)).

Vendrel argues that his trial counsel's failure was complete, as he was ill-prepared, failed to develop a coherent strategy or plausible theory of the case, did nothing to prepare the defense witnesses, and introduced evidence that bolstered the State's case.[2] But the record does not support his contention. To the contrary, the record shows that counsel engaged in discovery and filed pre-trial

---

[2] In the statement of facts in his appellate brief, Vendrel asserts that counsel had practiced very little criminal law. But counsel's testimony at the hearing on the motion for new trial, as summarized above, shows that although he had not tried a murder case as lead counsel, he did have significant experience in criminal practice. Moreover, "[t]he mere fact that the attorney may have been relatively inexperienced falls far short of demonstrating a complete failure of the adversarial process." *Dulcio v. State*, 292 Ga. 645, 650 (3) (a) (740 SE2d 574) (2013).

motions.[3] And the transcript shows that counsel interviewed the State's witnesses, interviewed and prepared defense witnesses, cross-examined most of the State's witnesses, and presented a theory of the case that was consistent with Vendrel's trial testimony. Under these circumstances, it cannot be said that counsel completely failed to test the State's case throughout the proceeding. Even assuming (without deciding) that counsel failed to act as an advocate on certain occasions, Vendrel has failed to establish that counsel failed to subject the State's case to adversarial testing in any meaningful way and therefore does not meet the stringent standard that raises a presumption of prejudice pursuant to *Cronic*. As a result, *Strickland*'s two-part test remains the appropriate standard to evaluate Vendrel's claim of ineffective assistance. See *Williams v. State*, 305 Ga. 776, 783 (2) (e) (827 SE2d 849) (2019) ("Even if [the defendant's] trial counsel failed to act as an advocate on the several

---

[3] More specifically, counsel elected to proceed under reciprocal discovery and filed general demurrers, a motion for a hearing pursuant to *Jackson v. Denno*, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964), and a motion to suppress Vendrel's statements.

occasions specified, [the defendant's] assertion that his counsel entirely failed to subject the State's case to adversarial testing does not meet the stringent standard that merits a presumption of prejudice under *Cronic*, and therefore *Strickland*'s two-part test remains the appropriate standard to evaluate his claims of ineffective assistance."). Accordingly, we turn to Vendrel's contention that counsel's "discrete errors . . . still require reversal."

2. Vendrel specifically contends that his trial counsel was constitutionally ineffective in three ways. To satisfy the deficiency prong of the *Strickland* test, the defendant "must show that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms." *Lofton v. State*, 309 Ga. 349, 360 (6) (846 SE2d 57) (2020). "This requires a defendant to overcome the strong presumption that counsel's performance fell within a wide range of reasonable professional conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment." *Scott v. State*, 306 Ga. 417, 419-420 (2) (831 SE2d 813) (2019) (citation and

punctuation omitted). "Decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." *Thomas v. State*, 311 Ga. 706, 714 (2) (a) (859 SE2d 14) (2021) (citation and punctuation omitted). The defendant must also show that the deficient performance prejudiced the defense, which requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U. S. at 694 (III) (B). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. If an appellant fails to show either deficiency or prejudice, this Court need not examine the other prong of the *Strickland* test. See *DeLoach v. State*, 308 Ga. 283, 287-288 (2) (840 SE2d 396) (2020).

(a) Vendrel contends that he was denied the effective assistance of trial counsel when trial counsel failed to interview the defense witnesses before trial, which Vendrel says resulted in his counsel inadvertently eliciting testimony on direct examination

17

about the volatile nature of Vendrel's relationship with Saffles. Vendrel argues that such testimony was detrimental to any conceivable defense and would have been excluded as inadmissible character evidence if offered by the State, and that any reasonable interview would have revealed that counsel should not have called the witnesses. Although the record contains evidence that counsel had not met Shepard before trial, and does not specifically show that counsel had interviewed Shepard, we have not found any indication in the record that counsel failed to interview the other defense witnesses, and Vendrel has not provided any citation to the record in support of that claim. To the contrary, counsel testified that he did interview and prepare defense witnesses. And, although the trial court made no express factual findings or credibility determinations in its order denying Vendrel's motion for new trial, we presume that the trial court implicitly credited counsel's testimony in making its decision. See *Anthony v. State*, 311 Ga. 293, 297 (3) (857 SE2d 682) (2021) ("Although the trial court made no express factual findings or credibility determinations in its order denying [the defendant's]

18

motion for new trial, it was nonetheless authorized to credit the testimony of [his trial] counsel, and in the absence of explicit factual and credibility findings by the trial court, we presume implicit findings were made supporting the trial court's decision. Accordingly, even though [the defendant's] testimony contradicted that of his counsel, the trial court implicitly credited counsel's version of events when it denied [the defendant's] ineffective assistance claim, and we accept the trial court's factual findings." (citations and punctuation omitted)). Thus, with respect to the defense witnesses other than Shepard, Vendrel has failed to make any showing that counsel's performance was deficient. See *Young v. State*, 317 Ga. 57, 64 (3) (c) (891 SE2d 827) (2023) (Because the defendant provided no citation to the record in support of his claim that trial counsel failed to timely request a hearing on his motion to suppress certain evidence and it does not appear that a particularized motion to suppress that evidence was ever filed, "counsel cannot be deficient for failing to request a timely hearing on a non-existent motion," and the defendant "has failed to show

19

that counsel's performance was deficient in this respect, and has not carried his burden of demonstrating that his trial counsel was constitutionally ineffective." (citation and punctuation omitted)); *Lord v. State*, 304 Ga. 532, 540 (7) (a) (820 SE2d 16) (2018) (Because the defendant's contention regarding the nature of certain testimony to which trial counsel failed to object was "not factually supported by the transcript," any objection for the reasons argued by the defendant would be misplaced and meritless, and therefore could not amount to ineffective assistance.); *Schutt v. State*, 292 Ga. 625, 628 (3) (a) (740 SE2d 163) (2013) (holding that the trial court was entitled to credit trial counsel's testimony that he met with the defendant's parents and prepared them for their testimony).

As for the alleged failure to interview Shepard, even assuming that trial counsel's performance was deficient in that regard, Vendrel has failed to show prejudice. Although Vendrel has suggested that counsel would not have called Shepard if counsel had "even briefly interviewed" Shepard, Vendrel has not explained how omitting Shepard's testimony would have been reasonably likely to

lead to a different outcome. See *Harris v. State*, 314 Ga. 370, 374 (2) (a) (877 SE2d 255) (2022) ("A defendant claiming that his counsel was underprepared must show that more preparation might have produced something that would have made a difference in the outcome of his trial. . . . [The defendant] has not explained how [a] different approach was reasonably likely to lead to a difference in the outcome of the trial." (citation and punctuation omitted)). Moreover, we are unable to discern a reasonable probability of a different result at trial. Shepard testified to an insulting gesture and threatening phone contact from Vendrel the day before Saffles' death, apparently related to Shepard's relationship with Vendrel. Shepard's testimony, however, was consistent with other testimony about problems in the relationship between Saffles and Vendrel, including further testimony by Shepard regarding Saffles' and Vendrel's "bad" arguments with each other, that laid groundwork for the defense theory of justification. And the evidence of Vendrel's guilt – especially his multiple confessions and changing stories, ballistics evidence, and the medical examiner's testimony – was

overwhelming. See *Talley v. State*, 314 Ga. 153, 162-163 (3) (a) (875 SE2d 789) (2022) (Although evidence of the defendant's threat against the victim that was related to a criminal enterprise "might have reflected negatively on [the defendant], even if objectionable, it was not particularly disparaging of [his] character when viewed in context, especially given the strength of the other admissible evidence against him." (citation and punctuation omitted)).

(b) Vendrel also contends that his trial counsel rendered ineffective assistance by failing to prepare Vendrel to testify, resulting in the abandonment of any lawful defense that he might have had. According to Vendrel, counsel did not meet with him before trial to prepare him to testify or discuss his right not to testify and, more specifically, did not discuss the State's evidence or its strength or caution him not to vilify the victim, but instead relied on Vendrel's sister to pass information back and forth. Once again, however, Vendrel has not shown that these claims are factually supported in the record, and counsel's testimony contradicted Vendrel's claims. Indeed, Vendrel did not testify at the hearing on

22

his motion for new trial, while his trial counsel testified about several meetings with Vendrel, in person and by phone, at which counsel discussed the State's evidence, discovered that Vendrel was "determined to testify," and developed a theory of self-defense based on Vendrel's account of the events. Moreover, evidence was presented at trial that supported the theory of self-defense, and Vendrel has not identified any other defense theory that counsel should have pursued. Vendrel therefore has failed to make any showing that counsel's performance was constitutionally deficient. See *Young*, 317 Ga. at 64 (3) (c); *Wilson v. State*, 313 Ga. 319, 323-324 (2) (b) (869 SE2d 384) (2022) ("Because some evidence supported the defense theory, and there was no other obviously stronger defense theory available, Appellant has not shown trial counsel's decision to be patently unreasonable."); *Owens v. State*, 298 Ga. 813, 817 (4) (783 SE2d 611) (2016) (Trial counsel "both honor[ed] [the defendant's] right to testify and preserve[d] her defense to the extent possible. Accordingly, trial counsel's performance was not deficient in this case."); *Funes v. State*, 289 Ga. 793, 796-797 (3) (c) (716 SE2d

183) (2011) ("The trial court's decision to credit [trial counsel's] account of Appellant's preparation to testify was not clearly erroneous, and we cannot conclude that this level of preparation fell below the broad range of reasonable professional conduct." (citations and punctuation omitted)).

(c) Vendrel contends that his trial counsel was ineffective for failing to conduct factual research or consult with experts to prepare to challenge the prosecution's forensic evidence, which was crucial to the State's case. Vendrel argues that, as a result, counsel was unable either to call his own experts in rebuttal or to cross-examine the State's experts intelligently. However, even assuming Vendrel has shown that counsel was deficient in preparing for the State's expert witnesses, Vendrel has altogether failed to establish any prejudice. At the hearing on his motion for new trial, Vendrel did not present any testimony or affidavit of an expert witness to substantiate his claim that relevant and favorable expert testimony could have been presented to the jury in rebuttal of the State's experts. See *Pauldo v. State*, 317 Ga. 433, 437 (1) (a) (893 SE2d 633)

(2023) ("It is well established that a defendant fails to establish prejudice under *Strickland* when he merely contends that trial counsel was deficient for failing to present an expert, without also presenting evidence at the motion-for-new-trial hearing about what the potential expert would have testified to at trial."); *Allen v. State*, 317 Ga. 1, 11 (4) (b) (890 SE2d 700) (2023) (To make the required affirmative showing of the prejudicial effect of trial counsel's failure to call a witness, "[e]ither the uncalled witness must testify or the defendant must introduce a legally recognized substitute for the uncalled witness's testimony." (citation and punctuation omitted)); *Patterson v. State*, 314 Ga. 167, 178 (3) (g) (875 SE2d 771) (2022) ("Appellant failed to present an expert witness to testify at the motion-for-new-trial hearing to substantiate his claim that the witness's testimony would have been relevant and favorable to his defense. Therefore, Appellant has failed to show that there is a reasonable probability the result of his trial would have been different because there is no evidence as to how a potential expert witness would have testified."). Likewise, Vendrel has failed either

25

to show how the State's expert witnesses should have been cross-examined or to call any of those witnesses at the motion-for-new-trial hearing to demonstrate how their testimony would have differed if cross-examination had been different. See *Harris v. State*, 314 Ga. at 374 (2) (a) (holding that the defendant failed to show "any prejudice arising from any lack of preparation on counsel's part" for the testimony of a witness for the State, where the defendant had "not even suggested what avenues his trial counsel left unexplored in his cross-examination, and [the witness] did not testify at the hearing on [the defendant's] motion for new trial").

3. Vendrel contends that the cumulative effect of his trial counsel's alleged deficient performance in this case caused actual prejudice to the defense. In Division 2, we assumed counsel's performance was deficient in two ways – failing to interview Shepard and failing to prepare for the State's expert witnesses – but concluded that Vendrel failed to establish that either assumed error of counsel prejudiced his defense. Vendrel also has not shown that these two assumed deficiencies, considered together, created a

reasonable probability that the results of the proceeding would have been different in their absence, so his claim of cumulative prejudice fails as well. See *Allen v. State*, 317 Ga. 1, 13 (4) (f) (890 SE2d 700) (2023).

*Judgment affirmed. All the Justices concur.*