308 Ga. 894
FINAL COPY

S20A0414.  ROUZAN v. THE STATE.

BOGGS, Justice.

Appellant Seth Joseph Brian Rouzan challenges his 2013 convictions for malice murder and another crime in connection with the shooting death of Joseph Williams, Jr. Appellant claims that the trial court applied the wrong legal test in admitting other acts evidence; committed plain error in failing to instruct the jury that an accomplice's testimony is not sufficient to establish a fact unless corroborated; and abused its discretion in denying his request to continue the hearing on his motion for new trial based on his motion-for-new-trial counsel's admitted failure to prepare for the hearing. We conclude that the trial court erred in applying an obsolete legal standard to allow the State to introduce the other acts evidence. Accordingly, we vacate the trial court's judgment and remand the case for the trial court to apply the correct test under the current

Evidence Code in exercising its discretion to decide whether the other acts evidence should have been admitted.[1]

1. Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. On August 21, 2012,

---

[1] Williams was killed on August 21, 2012. On November 13, 2012, a Richmond County grand jury indicted Appellant and Ronnie Jermaine Pontoon for malice murder, felony murder based on attempted armed robbery, and felony murder based on aggravated assault. Appellant also was charged with possession of a firearm during the commission of a felony by a person previously convicted of a felony involving the use or possession of a firearm, see OCGA § 16-11-133 (b) (1), and Pontoon was charged with possession of a firearm during the commission of a felony, see OCGA § 16-11-106 (b) (1). In May or June 2013, Pontoon, a minor, was allowed to enter a guilty plea to a reduced charge of attempted armed robbery in exchange for testifying against Appellant. On December 3, 2013, Appellant was re-indicted, and at a trial from December 16 to 19, 2013, the jury found him guilty of all charges. The trial court sentenced Appellant to serve life in prison without the possibility of parole for malice murder and a consecutive term of 15 years for the firearm conviction; the felony murder verdicts, which the trial court purported to merge into the malice murder verdict, were actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-372 (434 SE2d 479) (1993).

On December 27, 2013, Appellant filed a motion for new trial. More than five years later, on April 16, 2019, the trial court scheduled a hearing on the new trial motion for May 17, 2019. On April 30, 2019, Appellant, represented by new counsel, filed a motion to convert the hearing into a Uniform Superior Court Rule 41.2 status conference, which the trial court summarily denied on May 2, 2019. On May 14, 2019, the trial court rescheduled the motion for new trial hearing for May 21, 2019. At the May 21 hearing, Appellant's attorney announced that she had not been able to work on the new trial motion due to the press of other cases and requested a continuance, which the trial court denied. With the court's permission, Appellant filed an amended new trial motion in open court. On May 23, 2019, the trial court denied the motion. Appellant filed a timely notice of appeal. The case was docketed in this Court to the term beginning in December 2019 and was orally argued on April 23, 2020.

Williams' eight-year-old son got out of school at 4:15 p.m. The child's grandmother picked him up at school and dropped him off with Williams, who was sitting in the parking lot of his apartment complex drinking beer with a friend. Appellant walked up to Williams and asked for some pills, and Williams replied, "Hold up." Williams then walked his son, who had asked for something to eat, to a nearby fast food restaurant.

Fifteen-year-old Ronnie Pontoon lived in the same apartment complex as Williams but in a different building. Pontoon was walking home with his brother when he saw Terrence Scriven talking to Appellant in the breezeway of Pontoon's building. Scriven called Pontoon over and asked Pontoon if he had a gun, and Pontoon asked why. Appellant said that he wanted to buy the gun and asked Pontoon what type it was. Pontoon said it was a .22, and Appellant asked, "How much?" Pontoon replied, "Thirty dollars." Appellant agreed to buy the gun, saying that he needed it for a robbery.

Pontoon went to his apartment on the first floor to get the gun, which actually belonged to his brother. He went into the bedroom

that he and his brother shared and asked his brother if he could get the gun, but his brother said, "No." Appellant then came around to the bedroom window, which was open, and asked Pontoon's brother for the gun, but Pontoon's brother again said, "no." When Pontoon's brother went into the bathroom, Pontoon took the gun from the bedroom closet, went outside, and gave the gun to Appellant. Appellant said that he would meet up with Pontoon after the robbery to pay him at the home of Tymeka Jones, who lived in a nearby apartment complex. Pontoon then went to Jones' apartment to wait for Appellant.

Meanwhile, Williams and his son returned from the restaurant, and Williams' son began playing outside. Shortly before 5:53 p.m., Williams' son saw Appellant approach Williams with a gun.[2] Appellant again asked for some pills, and Williams replied, "I guess." Appellant then asked for the whole bottle, and when Williams refused, Appellant shot Williams in the forearm and in the

---

[2] According to Williams' son, Appellant got the gun out of a Ford truck, which no other witness mentioned.

chest, killing him. Appellant then went to Jones' apartment, where he paid Pontoon and hid the gun in a washing machine.

The next day, Investigator Chris Langford of the Richmond County Sheriff's Office and his partner went to Williams' apartment complex to canvass for witnesses who had not yet come forward. The officers saw Pontoon and his brother and went to speak with them, but Pontoon "took off running on foot." Pontoon's brother stayed and spoke with the officers, and at some point, Pontoon's brother told Langford that Appellant "was actually the person with the gun and the one that did the robbery."

The following day, Williams' son was shown a six-man photographic lineup and identified Appellant as the person who shot his father. That night, Appellant went to the police station, where Langford interviewed him. Appellant initially denied being in the area when the shooting occurred and said that he did not know anything about it but eventually acknowledged that he was at Williams' apartment complex around the time of the shooting. Appellant claimed that he went there to buy marijuana from

someone that he knew only as "Mr. Mike," that he overheard Pontoon talking to Terrence Scriven and another man about robbing Williams, and that he saw Pontoon with a gun. However, Appellant denied that he was involved in the shooting.

Williams' son was nine years old at the time of Appellant's trial. Williams' son testified that he saw Appellant shoot his father.[3] Pontoon testified about selling the gun to Appellant to commit a robbery on the day of the shooting and about meeting up with Appellant later that day to receive payment of $30. The medical examiner who performed the autopsy on Williams testified, as did Investigator Langford and several other law enforcement officers who were involved in the investigation. The State also introduced extensive evidence of Appellant's involvement in the December 2006 shooting death of Jeffrey LaBord that resulted in Appellant's entry of negotiated guilty pleas to voluntary manslaughter and burglary in July 2009.

---

[3] Williams' son also testified that he saw only the first shot, which he did not think hit his father, and that he heard but did not see the additional shots, because he "ran behind the apartments" after the first shot.

Appellant took the stand in his own defense. Appellant testified that on the day of Williams' murder, he went to Williams' apartment complex to buy marijuana from a man named "Mike." Appellant said that when he arrived, Mike, Pontoon, and Scriven were talking about robbing someone who lived in the complex, that a gun was mentioned, that Mike went to get the marijuana, and that as Mike was coming back, Appellant saw Pontoon with what looked like a gun. Appellant stated that when he left, Pontoon was still there, and that he heard gunshots as he was walking away from the complex. Appellant admitted that he "may have seen" Williams' son at the complex but denied having any contact with either Williams or Williams' son that day.

Appellant does not challenge the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's usual practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient as a matter of constitutional due

process to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also OCGA § 16-2-20 (defining parties to a crime); *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2.  Appellant contends — and the State concedes — that the trial court erred when it applied the wrong legal test in deciding whether to admit the other acts evidence concerning the shooting death of Jeffrey LaBord. We agree.

On February 13, 2013, the State filed a "Notice of State's Intent to Present Evidence of Similar Transactions" for the purposes of showing Appellant's intent, knowledge, course of conduct, bent of mind, and motive. On April 5, 2013, the trial court held a "Similar Transaction Hearing," at which the State said that it sought to admit evidence of Appellant's involvement in the December 2006 robbery and shooting death of LaBord to show Appellant's intent,

knowledge, and motive with respect to the pending charges; the State did not mention course of conduct or bent of mind. The State recited the pending charges against Appellant; recounted what it expected the evidence at trial to show regarding Williams' murder; and noted that Appellant's firearm charge for violating OCGA § 16-11-133 (b) (1) was based on his July 2009 guilty pleas to burglary and voluntary manslaughter in connection with the shooting death of LaBord.[4] The State also outlined the "similar transaction" evidence that it intended to present at Appellant's trial. According to the State's proffer, the "similar transaction" evidence would show as follows. Early on the morning of December 12, 2006, LaBord's body was found lying in the street. LaBord's house was robbed, and his car, which had blood in it, was found behind a vacant house in Appellant's neighborhood. Within hours of the shooting, Appellant was attempting to sell items taken from LaBord's house to people who lived in Appellant's neighborhood. Appellant lived with his

---

[4] The trial court later indicated that it would bifurcate the OCGA § 16-11-133 (b) (1) charge if it excluded the other acts evidence.

parents, who consented to a search of their house that evening. A pair of Appellant's shoes recovered from underneath his bed had blood on them, which DNA testing later showed came from LaBord.[5]

On May 3, 2013, the trial court entered a "Similar Transaction Order," finding that the State met its burden under *Williams v. State*, 261 Ga. 640 (409 SE2d 649) (1991),[6] and allowing the State to admit the evidence for the purposes of showing Appellant's intent, knowledge, and motive. At Appellant's December 2013 trial, more than half the testimony and more than two-thirds of the exhibits related to the LaBord incident. The trial court gave an other acts

---

[5] Appellant was indicted for the malice murder of LaBord, felony murder based on aggravated assault, armed robbery, possession of a firearm during the commission of a crime, and the burglary of LaBord's house. Appellant was tried for those crimes, but his trial ended in a mistrial. On July 13, 2009, Appellant entered negotiated guilty pleas to voluntary manslaughter and burglary and was sentenced to serve twenty years in prison with the first five years in confinement and the balance on probation.

[6] Under Georgia's old Evidence Code, when offering similar transaction evidence, the State had the burden to show that: (1) it sought to introduce the evidence "not to raise an improper inference as to the accused's character, but for some appropriate purpose which has been deemed to be an exception to the general rule of inadmissibility"; (2) "there [was] sufficient evidence to establish that the accused committed the independent offense or act"; and (3) "there [was] a sufficient connection or similarity between the independent offense or act and the crime charged so that proof of the former tend[ed] to prove the latter." *Williams*, 261 Ga. at 642.

limiting instruction before evidence of the LaBord incident was introduced and repeated the instruction as part of the jury charge.

Both the so-called "Similar Transaction Hearing" and Appellant's trial took place after the current Evidence Code went into effect on January 1, 2013. See Ga. L. 2011, p. 99, § 101 ("This Act shall become effective on January 1, 2013, and shall apply to any motion made or hearing or trial commenced on or after such date."). Under the current Evidence Code, the admission of evidence of "other crimes, wrongs, or acts" is governed by OCGA § 24-4-404 (b). Such other acts evidence is admissible under OCGA § 24-4-404 (b) only if: (1) the evidence is relevant to an issue in the case other than the defendant's character; (2) the probative value of the evidence is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," OCGA § 24-4-403; and (3) there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act. See *Worthen v. State*, 306 Ga. 600, 604-605

(832 SE2d 335) (2019). See also *Hood v. State*, 299 Ga. 95, 101-105 (786 SE2d 648) (2016) (discussing the proper application of this three-part test). But instead of applying the test for the admission of other acts evidence under the current Evidence Code, the trial court applied the test that we articulated in *Williams* for admitting similar transaction evidence under the old Evidence Code. This was error.

Moreover, the evidence of Appellant's involvement in the December 2006 shooting death of LaBord and Appellant's resulting guilty pleas to voluntary manslaughter and burglary in July 2009 was not relevant to the non-character purposes of proving Appellant's motive for committing the crimes for which he was on trial or any relevant "knowledge" on his part as that term is used in OCGA § 24-4-404 (b). See *Kirby v. State*, 304 Ga. 472, 487 (819 SE2d 468) (2018) (holding that the State's argument that an armed robbery showed the defendant's "inclination" to use violence to obtain money as he did in the crimes charged was a "classic improper propensity argument . . . identifying his motive to act in far too

generic a fashion"); *Thompson v. State*, 302 Ga. 533, 540 (807 SE2d 899) (2017) (holding that where the only similarities between an attempted armed robbery and the charged armed robberies and murders were the "all-too-common elements of guns and an assortment of co-conspirators," other acts evidence of the attempted armed robbery was not admissible to prove the defendant's motive for committing the charged crimes); Paul S. Milich, Ga. Rules of Evidence § 11:17 (Oct. 2019 update) (explaining that "knowledge" in OCGA § 24-4-404 (b) refers either to a special skill like safecracking, bomb-making, or document forgery or to specific knowledge based on past experience such as the admission of a prior assault conviction in a criminal trespass prosecution to establish the defendant's knowledge that he was not welcome on the invaded premises).

Applying the correct test under the current Evidence Code, the trial court may have been able to admit at least some of the challenged evidence for the purpose of showing Appellant's intent. After all, Appellant was charged with malice murder and felony

murder based on aggravated assault in connection with both shootings, and he was charged with the armed robbery of LaBord and with felony murder based on the attempted armed robbery of Williams. See *Hood*, 299 Ga. at 101 (stating that other acts evidence is *relevant* for the non-character purpose of showing intent where "'the same state of mind was required for committing the prior act[s] and the charged crimes'" (citation omitted)). See also *Brewner v. State*, 302 Ga. 6, 12-14 (804 SE2d 94) (2017) (holding that there was no plain error in admitting evidence of the defendant's involvement in a previous home invasion and robbery where the defendant claimed that he merely introduced the participants in the home invasion and armed robbery for which he was on trial with no intent to further orchestrate or actively assist in the enterprise).

However, given the sheer volume of the LaBord-related evidence that was admitted, the trial court properly could have exercised its discretion under the current Evidence Code to conclude that the *probative value* of that evidence on the issue of intent was substantially outweighed by the danger of unfair prejudice,

confusion of the issues, or misleading the jury or by considerations of undue waste of time or needless presentation of cumulative evidence. See OCGA § 24-4-403; *Hood*, 299 Ga. at 101 (stressing that "it is important to distinguish between the *relevance* and the *probative value* of the other acts evidence in question" in applying the first and second parts of the OCGA § 24-4-404 (b) test (emphasis in original)). See also *Jackson v. State*, 306 Ga. 69, 78-79 & n.10 (829 SE2d 142) (2019) (explaining that where neither side argues that the charged conduct was unintentional, other acts evidence has minimal probative value on the issue of intent, and stating that "an issue of *identity*, not intent," is presented where the defendant disputes that he was the shooter (emphasis in original)).

Finally, we cannot say that any error in the admission of the challenged evidence was harmless. The harmless error test for nonconstitutional error is whether it is highly probable that the error did not contribute to the verdict. See *Jackson*, 306 Ga. at 80. In determining whether a legal error by the trial court was harmless, "we review the record de novo and weigh the evidence as

we would expect reasonable jurors to have done so." Id. (citation and punctuation omitted). As explained above in Division 1, when viewed in the light most favorable to the verdicts, the evidence of Appellant's guilt was sufficient to satisfy due process. But aside from the other acts evidence of Appellant's intent, Appellant's convictions rest on the testimony of a nine-year-old child, Appellant's initial willingness to lie to police about his whereabouts and knowledge of the shooting, the statement by Pontoon's brother to Investigator Langford that Appellant had the gun and attempted to rob Williams, and the testimony of Pontoon, a minor who was himself indicted for the murder and thus had a motive to lie and who at the very least was willing to steal a gun from his brother and sell it to a man to commit a robbery.[7] By contrast, the evidence presented to the jury of Appellant's guilt for the killing of LaBord was both extensive and strong.

---

[7] The State conceded at oral argument that the trial court should have given an accomplice corroboration jury instruction.

In short, the evidence supporting Appellant's convictions was not so strong that we can say that it is highly probable that the jury was not improperly influenced by the strength and sheer volume of the other acts evidence concerning another homicide. See *Old Chief v. United States*, 519 U.S. 172, 180-181 (117 SCt 644, 136 LE2d 574) (1997) ("'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one. Such improper grounds certainly include . . . generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged (or, worse, as calling for preventive conviction even if he should happen to be innocent momentarily)." (citation and punctuation omitted)). Accordingly, we cannot say that any error in the admission of the other acts evidence was harmless.

The proper course under this Court's precedents for similar errors is to vacate the trial court's judgment and to remand the case to the trial court with direction to exercise its discretion to determine under the correct OCGA § 24-4-404 (b) test if the other acts evidence

was properly admitted. See *Moore v. State*, 290 Ga. 805, 809-810 (725 SE2d 290) (2012) (collecting cases). See also *Parker v. State*, 296 Ga. 586, 596 (769 SE2d 329) (2015) (holding that the Court of Appeals should have vacated the defendant's convictions and the trial court's order that was based on an erroneous evidentiary ruling, reversed the trial court's exclusion of the defendant's proffered documents, and remanded the case to the trial court with direction to issue a new order after considering the improperly excluded documents). If the trial court decides under the correct test that the other acts evidence was properly admitted, then the court should reenter the judgment against Appellant, who could then take another appeal challenging that ruling. See *Parker*, 296 Ga. at 597; *Moore*, 290 Ga. at 810. If, on the other hand, the court decides that the other acts evidence should have been excluded, then a new trial will be necessary. See *Parker*, 296 Ga. at 597; *Moore*, 290 Ga. at 809.

3. We do not address Appellant's other enumerations of error because they relate to issues that are unlikely to recur in the event of a retrial. Appellant may raise them again in a renewed

appeal if the trial court does not grant him a new trial and reenters the judgment.

*Judgment vacated and case remanded with direction. All the Justices concur.*

DECIDED JUNE 1, 2020.
Murder. Richmond Superior Court. Before Judge Craig.
*Veronica M. O'Grady, Brandon A. Bullard*, for appellant.
*Natalie S. Paine, District Attorney, Joshua B. Smith, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.