319 Ga. 711
FINAL COPY

S24G0007. GARRISON v. THE STATE.

PETERSON, Presiding Justice.

Georgia case law makes clear that the State generally must allege and prove that a prosecution is brought within the applicable statute of limitations. Although this requirement is most often satisfied by alleging and proving the date that the crime was committed, sometimes more is required. One line of precedent holds that in prosecutions where the State seeks to toll the applicable limitations period under statutes permitting such tolling in specific factual situations, the State must also allege and prove the facts that trigger the statutory tolling. At the same time, another case holds that the State need not allege and prove extensions of limitations periods that are effective by operation of law, such as when a timely indictment is quashed or a nolle prosequi is entered. This case involves an issue that does not neatly fit into either of those two lines of precedent.

Here, the Court of Appeals concluded that the State was not required to allege and prove the tolling or extension of limitations periods arising from the Chief Justice's emergency orders during the COVID-19 pandemic. We granted certiorari on that issue. We now conclude that the State is not required to allege and prove that the emergency orders afforded additional time in which to bring a prosecution. Our tolling precedent generally requires the State to allege and prove facts that establish tolling applies so that a defendant has notice of all matters she must defend against. But the existence of the Chief Justice's emergency orders is not the kind of fact that the State is required to prove. Absent a requirement for the State to prove the fact of the emergency orders (or a challenge to the validity of the emergency orders, which the defendant here does not assert), there is nothing for a defendant to defend against. And other procedural mechanisms exist for the defendant to require the State to provide notice of its reliance on emergency orders before trial.

We also granted certiorari to determine whether admission of horizontal gaze nystagmus ("HGN") test evidence must be assessed

according to the new standard imposed by a recent amendment to OCGA § 24-7-702. We conclude that it must be, that this new standard was not applied below, and that if the evidence was not admissible under the new standard, the trial court's error in admitting it under the wrong standard would not have been harmless. Therefore, we vacate the Court of Appeals's judgment and remand the case to the trial court for it to determine under the proper standard whether testimony regarding the HGN test was properly admitted.

1. *Background.*

On November 15, 2018, Garrison was involved in a traffic accident that gave rise to the charges in this case. The State filed its initial accusation against Misty Michelle Garrison on May 29, 2019, charging Garrison with three misdemeanor counts: DUI (less safe) (alcohol) under OCGA § 40-6-391 (a) (1), failure to maintain lane under OCGA § 40-6-48, and improper tires under OCGA § 40-8-74. The State then filed an amended accusation on January 12, 2021, charging Garrison with four misdemeanor counts: DUI (less safe)

3

(combined influence) under OCGA § 40-6-391 (a) (4), DUI (less safe) (alcohol) under OCGA § 40-6-391 (a) (1), failure to maintain lane under OCGA § 40-6-48, and improper tires under OCGA § 40-8-74.

The evidence at trial showed the following.[1] On November 15, 2018, around 12:00 p.m., Garrison crashed her boyfriend's truck into a utility pole, snapped the pole in half, and the truck rested on half the pole while loose wires dangled around the truck.

A man who lived near the single-vehicle accident testified that he lost power, went outside, and saw a truck propped on the broken pole. He called 911 as the driver tried to get out of the truck, and he took pictures of the scene, but he interacted with the driver only "[f]rom a distance" and "didn't get close enough" to observe anything unusual or whether she was impaired.

Deputy Rachel Mann responded first to the scene, and she arrived as Garrison was removing items from the truck. Concerned

---

[1] This case calls us to consider whether an error was harmless, so we recount the evidence reasonably and in detail, weighing it as we would expect reasonable jurors to have done, as opposed to viewing it only in the light most favorable to the jury's verdict. See *Moore v. State*, 315 Ga. 263, 264 (1) n.2 (882 SE2d 227) (2022).

4

about the live wires, Deputy Mann guided Garrison away from the truck. Deputy Mann testified that she did not remember an odor of alcohol or have a reason to say that Garrison was under the influence of alcohol or drugs.

Lt. Doug Brackett also responded to the scene and testified at trial that he did not remember whether he smelled alcohol.[2] He testified that, although the roads were "damp" or "wet" and pine needles had fallen, he "didn't see anything" that would have caused the accident. On cross-examination, he opined that it was possible that the combination of the road's curve, wet roads, pine needles, and the truck's bald tires could have caused the accident.

Trooper Kyle McSweeny responded to the scene and received information that, on the same day and at a gas station immediately before this incident, Garrison failed to secure the truck before exiting the truck, and the truck started rolling away from her. After receiving this information about the separate incident, Trooper

---

[2] In a redacted video recording from another trooper's dash camera that was played for the jury, Lt. Brackett stated, "I can't smell no alcohol."

McSweeny then approached Garrison while she was "near the back of the truck, or the bed of the truck," where a gasoline container had spilled and where he noticed the "rear tires were slick all the way down" and had "[n]o significant tread all the way down to the wear bars." There was "a strong odor of gasoline fumes[,]" so he did not smell alcohol initially, but after he and Garrison moved "a good distance away from the pickup truck[,]" he smelled "a slight odor of alcoholic beverage emitting from her person and breath and mouth[.]"

Trooper McSweeny asked Garrison if she had consumed alcohol in the past 24 hours, which Garrison denied. But she later "changed her story" and "said she had dr[u]nk beer the night before." When asked if she had taken other drugs or medication, Garrison answered yes and showed him her prescription bottle for phentermine, containing a few pills, which she took "for the purposes of diet" and had taken that morning.[3] Trooper McSweeny

---

[3] According to a redacted video recording from Trooper McSweeny's dash camera, which was played for the jury, Garrison claimed she took half a pill that morning around 6:30 a.m.

asked about the separate incident at the gas station, which Garrison confirmed, explaining that it was a common mistake and that she was distracted because she had "a lot on her plate."

Trooper McSweeny concluded that Garrison was under the influence of alcohol or drugs and asked whether Garrison would submit to field sobriety tests. Garrison agreed and immediately, without prompting, "attempted to demonstrate to where she started to bring her arms up and trying to stand on one leg[,]" and she "was wobbly."[4] Trooper McSweeny performed the HGN test and testified at trial about his training to perform that test, how it worked, that he had administered it between 500 and 800 times, what he looked for in performing that test, and how, based on his experience, he had "noticed a correlation between alcohol impairment and nystagmus[.]"[5] He opined that the HGN test was "considered to be

---

[4] According to the dash camera video recording, Garrison told Trooper McSweeny that she had a knee issue that could cause her to "lose balance on this knee if [she] tried to hold it up" before attempting to stand on one leg.

[5] Garrison also elicited the opinions of Deputy Mann, Lt. Brackett, and Trooper McSweeny that if someone suffered a head injury after an accident like this, the head injury would affect the HGN test results. However, each of

7

the most scientifically proven" and "reliable[,]" and said that with respect to Garrison he observed "[s]ix out of six clues[,]" which he said indicated "[i]mpairment. Driving under the influence."[6] Garrison objected, and the following exchange ensued:

> GARRISON'S COUNSEL: Judge, I'm going to object to him concluding it was impairment. He can conclude, I guess, he thought there was alcohol consumption but not that there's impairment.
> STATE: I disagree, Judge. I don't think that's the case law that's out there, and I don't think that's the way this court has ruled on that either. I think six out of six clues, he can testify, is indication of impairment.
> GARRISON'S COUNSEL: Just to preserve the record, that would be a *Daubert* challenge —
> COURT: Overrule the objection.

Trooper McSweeny also opined that, based on his experience, formal training, and observation of Garrison, "she was under the influence of alcohol to the extent to make her a less safe driver." He testified

---

those witnesses also testified that he or she did not observe a head injury. Deputy Mann testified that she did not recall Garrison mentioning a head injury, observe a head injury, or call for EMS to respond to the scene. And Trooper McSweeny similarly testified that Garrison did not mention a head injury. Garrison has pointed to no record evidence that she had a head injury.

[6] Later, Trooper McSweeny also testified that Garrison "had constricted pupils" during his administration of the HGN test and that what he "observed was the same thing that [he had] always observed even in training and other cases where there were clues that led [him] to believe the person was impaired."

8

that he placed her under arrest, which she resisted, and he read her the implied consent warning before she declined the blood test.

A redacted video recording from Trooper McSweeny's dash camera was played for the jury, captured his encounter with Garrison, and showed the administration of the field sobriety tests, as well as Garrison arguing, crying, resisting arrest, and declining a blood test. Similarly, a video recording from inside Trooper McSweeny's vehicle, which was played for the jury, showed Garrison arguing, yelling, and cursing after arrest.

During cross-examination, Garrison emphasized that Trooper McSweeny did not perform the "walk and turn and one leg[,]" and she challenged his training, opinions, and knowledge of the HGN test. Trooper McSweeny testified that he did not perform the other tests due to Garrison's "admission that she would probably have issues with trying to do certain stuff" based on injuries she had previously sustained, and because "with an HGN alone, it has proven to be the most scientific of all the evaluations put together."

While Garrison did not testify in her own defense, a

9

hairdressing client of Garrison testified that he had an "uneventful" 20-to-30-minute hair appointment with Garrison less than two hours before the incident and that he did not notice any odor of alcohol or drug impairment.

During closing argument, both parties mentioned the HGN evidence. Garrison challenged Trooper McSweeny's method of performing the HGN test and again challenged his opinions, training, and knowledge of the HGN test. The State contended that there was evidence of alcohol, stating that "[t]he trooper [could] smell it on her breath. Not only that, he did a scientific test to determine if she was impaired. That's what he told you. That test is used to determine if someone was impaired." The State continued: "That test shows she was impaired. You don't have to believe that test, look at the truck."[7]

At the conclusion of the trial, the jury found Garrison guilty of all counts. Garrison then filed in open court a motion in arrest of

---

[7] The State also claimed the "biggest piece of evidence [the jury was] going to have in this case is this truck."

judgment, arguing that a "simple review of this accusation show[ed] it was filed well beyond the statute of limitations" and that the State failed to allege and prove an exception to the statute of limitations. The trial court ultimately denied her motion based on orders issued by then-Chief Justice Melton under the Judicial Emergency Act, OCGA §§ 38-3-60 to 38-3-64, to create and extend a statewide judicial emergency due to the COVID-19 pandemic,[8] finding that the amended accusation was filed within the statute of limitations given the extension established by the Chief Justice's orders.

The trial court sentenced Garrison on Counts 1, 3, and 4 and merged Count 2 with Count 1. Garrison appealed to the Court of Appeals, which affirmed. See *Garrison v. State*, 368 Ga. App. 819 (890 SE2d 869) (2023). Relevant to issues on which we granted certiorari, the Court of Appeals held that although the statute of limitations "would have originally expired on November 18, 2020, the COVID-19 judicial emergency orders suspended the running of

---

[8] Supreme Court of Georgia, Court Information Regarding the Coronavirus, https://www.gasupreme.us/court-information/court_corona_info/ (last visited July 2, 2024).

the limitation period such that [it] did not expire until after the State filed its amended accusation on January 12, 2021." Id. at 824 (1) (b). The Court of Appeals also affirmed the trial court's admission of HGN testimony based on a standard developed based on *Harper v. State*, 249 Ga. 519 (292 SE2d 389) (1982), under which the trial court could admit scientific evidence only if it found that the party offering the evidence showed that (1) the "general scientific principles and techniques involved are valid and capable of producing reliable results" and (2) the "person performing the test substantially performed the scientific procedures in an acceptable manner." *Garrison*, 368 Ga. App. at 826 (3).

2. *Georgia law generally does not require the State to allege or prove orders issued under the Judicial Emergency Act.*

Garrison contends that the Court of Appeals erred in holding that the State need not allege and prove its reliance on orders under the Judicial Emergency Act as an exception to the statute of limitations. We disagree.

In criminal cases, the statute of limitations period generally

12

begins running on the date of the commission of the offense, and to be timely, the indictment must be returned before the limitations period expires. See *Riley v. State*, 305 Ga. 163, 167 (3) (824 SE2d 249) (2019). Misdemeanors like the ones of which Garrison was convicted are subject to a two-year limitations period. See OCGA § 17-3-1 (e). But there are circumstances that can extend or pause the running of a limitations period. "Broadly speaking, OCGA § 17-3-1 limits the time within which a prosecution for particular offenses must commence, while OCGA §§ 17-3-2, 17-3-2.1, and 17-3-2.2 specify periods that are excluded from the various limitations periods[,]" known as tolling exceptions, and OCGA § 17-3-3 specifies circumstances that can warrant an extension of the statute of limitations. *State v. Outen*, 296 Ga. 40, 42 (2) (764 SE2d 848) (2014).

The State bears the burden to prove that a crime occurred within the statute of limitations. See *Lewis v. State*, 306 Ga. 455, 462-463 (4) (831 SE2d 771) (2019). Under our precedent, whether the State relies on an *exception* under OCGA §§ 17-3-2, 17-3-2.1, and 17-3-2.2 or an *extension* under OCGA § 17-3-3 generally determines

13

the State's burden to allege and prove the application of such a provision. But the emergency orders at issue here do not fit neatly in either category.

(a) *Our precedent holds that tolling exceptions to the statute of limitations differ from extensions of the statute of limitations.*

The General Assembly has chosen to create tolling exceptions to the statute of limitations that pause the running of the limitations period for varying durations of time when certain specified facts are present, and these exceptions are set forth in OCGA §§ 17-3-2, 17-3-2.1, and 17-3-2.2.[9] Because these tolling exceptions are triggered only upon the occurrence of specified facts, if the State relies on such an exception "to prevent the bar of the statute of limitation[s], it

_____

[9] OCGA § 17-3-2 tolls the statute of limitations for "any period" where "[t]he accused is not usually and publicly a resident within this state[,]" "[t]he person committing the crime is unknown or the crime is unknown[,]" "[t]he accused is a government officer or employee and the crime charged is theft by conversion of public property while such an officer or employee[,]" or "[t]he accused is a guardian or trustee and the crime charged is theft by conversion of property of the ward or beneficiary." OCGA § 17-3-2. OCGA § 17-3-2.1 tolls the applicable time period only for particular crimes and only until the victim reaches a particular age or the violation is reported, whichever is first. See OCGA § 17-3-2.1. And OCGA § 17-3-2.2 tolls the applicable period only if the victim is a particular age and until the violation is either reported or discovered by the appropriate government agency, whichever is first. See OCGA § 17-3-2.2.

14

must be alleged and proved." *Taylor v. State*, 306 Ga. 277, 286 (3) (b) (830 SE2d 90) (2019) (citation and punctuation omitted).

We have long held that "an exception to the statute of limitation[s] is a material allegation which must be alleged" in the accusation, see *Taylor*, 306 Ga. at 286 (3) (b) (punctuation omitted), and the State bears the burden to prove "that the case falls properly within the exception," *Lewis*, 306 Ga. at 463 (4). This rule exists "to notify the defendant, that he may be prepared to meet all the allegations on the part of the State, at the trial." *McLane v. State*, 4 Ga. 335, 341 (2) (1848). And the failure to allege in the accusation a tolling exception under those provisions renders the accusation fatally defective as a matter of law. See *Rivera v. State*, 317 Ga. 398, 407 (1) (b) (893 SE2d 696) (2023).

Although some later Georgia case law suggests due process roots for this rule, the actual source of this rule appears merely to be Georgia decisional law.[10] Due process generally requires that,

---

[10] For her part, Garrison makes no constitutional argument in her briefing, which focuses principally on statutory construction and our decisional

15

once state substantive law establishes the essential elements of a crime, the State must allege and prove all essential elements of that crime. See *Hamling v. United States*, 418 U.S. 87, 117 (II) (94 SCt 2887, 41 LE2d 590) (1974) (indictment is sufficient if it "contains the elements of the offense charged[,]" "fairly informs a defendant of the charge against which he must defend," and "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense" (citations omitted)). But as far as we can tell from the briefing and our own research, and despite a handful of Court of Appeals cases characterizing this rule otherwise,[11] we have never held that the requirement to allege and prove tolling of a limitations period converts that tolling into an essential element of the charged

law. The Georgia Association of Criminal Defense Lawyers ("GACDL") filed an amicus brief, and although it gets closer to invoking a constitutional argument, GACDL does not actually make such an argument either.

[11] A handful of Court of Appeals opinions have characterized this rule as making timeliness "one of the essential elements of the offense." *Taylor v. State*, 44 Ga. App. 64, 74 (160 SE 667) (1931) (citing no authority for that particular statement); see also *State v. Tuzman*, 145 Ga. App. 481, 485 (243 SE2d 675) (1978) (Bell, C. J., dissenting) (citing *Taylor* and *Decker v. State*, 139 Ga. App. 707 (229 SE2d 520) (1976) (not containing language regarding essential elements)), abrogated in part on other grounds by *State v. Outen*, 289 Ga. 579 (714 SE2d 581) (2011).

crimes.

We made a single passing reference to due process in *McLane*, 4 Ga. at 340, but our analysis there appeared to be a combination of statutory construction and judicial policy making more than anything approaching a traditional due process analysis.[12] See id. at 341-342 (noting that statutes of limitations in civil cases are affirmative defenses to be pleaded by the defense, but that "we are unwilling to apply that rule to criminal causes, in which the life and liberty of the citizen is involved; believing, as we do, that it is the most regular and safe rule to adopt, to require the particular

---

[12] Currently, due process applies both to criminal cases in which the State seeks to deprive a criminal defendant of "life" or "liberty," and to cases seeking to deprive a person of "property." See U.S. Const. Amend. XIV ("nor shall any State deprive any person of life, liberty, or property, without due process of law"); Ga. Const. of 1983, Art. I, Sec. I, Par. I ("No person shall be deprived of life, liberty, or property except by due process of law."). We note that neither constitutional guarantee of due process applicable to Georgia existed at the time that *McLane* was decided, the Fourteenth Amendment being adopted in 1868 and the Georgia Due Process paragraph first entering the Georgia Constitution in 1861. See *State v. Turnquest*, 305 Ga. 758, 769 (3) (b) (827 SE2d 865) (2019) ("An express due process provision first entered the Georgia Constitution in 1861," was amended slightly in 1865 to protect "persons" instead of "citizens," and "[a] substantially identical version of this provision has been readopted in every Georgia Constitution since.") (citations omitted).

exception mentioned in the Statute, intended to be proved at the trial, to prevent its operation, to be alleged in the indictment"). *McLane*'s holding applies only to the statutory exceptions at issue there, and so the extent to which *McLane* may be incorporated into Georgia's later-adopted due process requirements, it would similarly be limited to those exceptions.[13]

Moreover, the notice requirements associated with statutory tolling exceptions are not required in at least one other context. For example, in OCGA § 17-3-3, the General Assembly has chosen to extend the statute of limitations for a set duration in certain

---

[13] United States Supreme Court precedent provides that although federal due process requires essential elements to be alleged and proved, timeliness is not an essential element. See *Musacchio v. United States*, 577 U.S. 237, 248 (III) (B) (136 SCt 709, 193 LE2d 639) (2016) ("When a defendant fails to press a limitations defense, the defense does not become part of the case and the Government does not otherwise have the burden of proving that it filed a timely indictment."); *United States v. Sisson*, 399 U.S. 267, 288 (II) (B) (90 SCt 2117, 26 LE2d 608) (1970) ("It has never been thought that an indictment, in order to be sufficient, need anticipate affirmative defenses[.]"); *Biddinger v. Commissioner of Police of City of New York*, 245 U.S. 128, 135 (38 SCt 41, 62 LE 193) (1917) ("The statute of limitations is a defense and must be asserted on the trial by the *defendant* in criminal cases[.]" (emphasis added)); *United States v. Cook*, 84 U.S. 168, 179-180 (21 LE 538) (1872) (quashing an indictment for failure to plead exception to statute of limitations would "deprive the prosecutor of the right to reply or give evidence" that either an exception applied or that the indictment was found and filed in the proper time period).

instances upon the occurrence of a specified procedural event. If an accusation is brought within the applicable limitations period "and is quashed or a nolle prosequi is entered," OCGA § 17-3-3 provides that "the limitation shall be extended six months from the time the first [accusation] is quashed or the nolle prosequi entered." OCGA § 17-3-3. Put another way, under that provision, if a timely accusation is quashed or nolle prossed, the State can re-accuse a defendant within six months of the date it was quashed or nolle prossed "without running afoul of the statute of limitation[s,] even if the initial statute of limitation[s] period has run." *Sallie v. State*, 276 Ga. 506, 513 (12) (578 SE2d 444) (2003).

Unlike with the fact-based statutory tolling exceptions, there is not a meaningful defense to be mounted against the occurrence of a procedural event (i.e., a timely accusation is quashed or nolle prossed). In *Sallie*, we held that "OCGA § 17-3-3 provides an extension of the statute of limitation[s] period and not an exception to it that must be pled in the indictment." 276 Ga. at 513-514 (12). Indeed, if a timely accusation is quashed or nolle prossed, the State

19

does "not need to allege an exception to the statute of limitation[s]" because "OCGA § 17-3-3 specifies that the statute of limitation[s] is extended six months if an indictment brought within the statute of limitation[s] is later nolle prossed." *Sallie*, 276 Ga. at 513 (12).[14]

Given this background, the parties purport to categorize orders issued under the Judicial Emergency Act as either a tolling exception or an extension. Garrison argues that orders issued under that Act operate similarly to tolling exceptions such that the State's failure to allege and prove its application rendered the amended accusation fatally defective as a matter of law. Conversely, the State contends that orders issued under the Act are analogous to extensions, so the State need not allege or prove its application to prolong the limitations period. But upon careful consideration of the Judicial Emergency Act, orders issued under it do not fit either category.

---

[14] Some of us question *Sallie*'s reasoning, to the extent there was any reasoning offered at all. And during oral argument, Garrison questioned in passing the reasoning in *Sallie*. But neither party has asked us to consider whether *Sallie* was rightly decided, and so we express no opinion on that question here.

(b) *Orders issued under the Judicial Emergency Act are separate and distinct from tolling exceptions and extensions.*

The Judicial Emergency Act empowers an authorized judicial official[15] to "declare the existence of a judicial emergency" by issuing an order when "the emergency substantially endangers or infringes upon the normal functioning of the judicial system," including "the ability of persons to avail themselves of the judicial system," or "the ability of litigants or others to have access to the courts or to meet schedules imposed by court order or rule, statute, or administrative rule or regulation." OCGA § 38-3-61 (a); OCGA § 38-3-60 (2). The Act requires such an order to contain specific details, see OCGA § 38-3-61 (a), (c), limits the validity of any order issued under the Act to a specific duration, see OCGA § 38-3-61 (b), and requires the issuing judicial official to provide notice in accordance with the Act,[16] see

---

[15] The Act defines an "[a]uthorized judicial official" as the following, when acting in regard to his or her jurisdiction: the Chief Justice of the Georgia Supreme Court, a chief judge of a Georgia superior court judicial circuit, or any successor to those officials, "as determined by the applicable rules of incapacitation and succession[.]" OCGA § 38-3-60 (1).

[16] To provide notice, the authorized judicial official shall:

> (1) Immediately notify the Chief Justice of the Georgia Supreme Court of the action;

21

OCGA § 38-3-63. Moreover, the Act provides an avenue of appeal to any "person whose rights or interests are adversely affected" by such order, order modification, or order extension. OCGA § 38-3-64.

Upon the issuance of an order (or the subsequent modification or extension of that order), the Act empowers the authorized judicial official "to suspend, toll, extend, or otherwise grant relief from deadlines or other time schedules or filing requirements imposed by[,]" among other things, "[a] statute of limitation[.]" OCGA § 38-3-62 (a) (1). Once the authorized judicial official complies with the Act in issuing and providing notice of the order, the order is effective in

---

(2) Notify and serve a copy of the order, modification, or extension on the judges and clerks of all courts sitting within the jurisdictions affected and on the clerks of the Georgia Court of Appeals and the Georgia Supreme Court, such service to be accomplished through reasonable means to assure expeditious receipt; and

(3) Give notice of the issuance of the order, modification, or extension to the affected parties, counsel for the affected parties, and the public. Notice shall be provided by whatever means are reasonably calculated to reach the affected parties, counsel for the affected parties, and the public and may, without limitation, include mailing, publication in a newspaper of local or state-wide distribution, posting of written notices at courthouses and other public gathering sites, transmittal by facsimile or e-mail, and announcements on television, radio, and public address systems.

OCGA § 38-3-63.

22

every case, "whether in civil or criminal cases or administrative matters," and as against every party or interested person within the jurisdiction of the issuing official, regardless of the facts of those cases. OCGA § 38-3-62.

Given this background, orders issued under the Judicial Emergency Act do not resemble either a tolling exception similar to those under OCGA §§ 17-3-2 to 17-3-2.2 or an extension similar to that provided by OCGA § 17-3-3. Instead, whether the State must allege and prove orders issued under that Act that "suspend, toll, extend, or otherwise grant relief" from the statute of limitations must be determined by the considerations underlying our precedent.

Nothing in the Judicial Emergency Act, which is located in an entirely different title of the Georgia Code, references OCGA §§ 17-3-2 to 17-3-3, and nothing in those provisions references the Judicial Emergency Act. Moreover, orders issued under the Judicial Emergency Act operate differently than the exceptions and extension provided by those other provisions.

Unlike the tolling exception provisions set forth in OCGA §§

23

17-3-2 to 17-3-2.2, which are clearly limited in application to criminal cases and to the *factual* scenarios set forth in those provisions,[17] orders under the Judicial Emergency Act apply identically to every case within the scope of the order and within the jurisdiction of the issuing judicial official to the extent provided in the order, "whether in civil or criminal cases, or administrative matters," regardless of the facts of those cases. OCGA § 38-3-62; cf. OCGA §§ 17-3-2 to 17-3-2.2.[18] Although exceptions under those provisions necessarily involve a question of fact — i.e., whether the facts triggering the exception are present — no such question of fact exists for the contested orders issued under the Act in this case,

---

[17] OCGA §§ 17-3-2 to 17-3-2.2 statutorily list factual scenarios where those provisions toll the statute of limitations. See OCGA §§ 17-3-2 to 17-3-2.2. Those lists do not include orders issued under the Act. See id.

[18] This Court has said in some cases that such orders tolled the applicable filing deadline. See, e.g., *Vendrel v. State*, 318 Ga. 233, 233 n.1 (897 SE2d 751) (2024) (order "tolled" filing requirements); *Harper v. State*, 310 Ga. 679, 679 n.1 (853 SE2d 645) (2021) (order "tolled" the time within which to appeal); *Mobuary v. State*, 312 Ga. 337, 339 (862 SE2d 553) (2021) (filing deadlines "were tolled" by the order, as extended in subsequent orders). But the use of the word "toll" in those cases, which did not address the issue raised here, did not convert tolling under the Judicial Emergency Act into a tolling exception that necessarily involves a question of fact such that underlying considerations require the State to give notice of its reliance on such tolling.

which are effective in all cases as a matter of law upon the official's issuance of the order in compliance with the Act.[19] Indeed, the order in this case was definite in its terms and depended on no factual predicate for its effectiveness.[20]

Nor does an order issued under the Act resemble an extension under OCGA § 17-3-3. Although an extension under that provision requires both an initial timely accusation and that the accusation be either quashed or nolle prossed for the extension to apply, the entry of an order in compliance with the Judicial Emergency Act alone triggers the effectiveness of an order issued under the Act. There is no threshold need for an initial accusation or for that accusation to be quashed or nolle prossed; the order is effective even as to cases not yet filed. And although an extension is effective on a case-by-case basis, an emergency order is effective in every case within the

---

[19] This is not to say that a party could never challenge the validity of such an order. But the parties do not challenge the validity of the orders at issue here.

[20] We express no opinion as to whether the same would be true if an order issued under the Judicial Emergency Act depended for its effectiveness on a factual predicate. Nor do we express any opinion as to whether the Judicial Emergency Act would permit such an order.

jurisdiction covered by the order.

(c) *The State need not allege or prove the application of orders issued under the Judicial Emergency Act to rely on such orders to prolong the limitations period.*

Although the Judicial Emergency Act imposes particular notice requirements on an authorized judicial official for the order to become effective, it does *not* impose similar notice requirements on the State in order for the State to rely on such orders. Rather, the text of the Act makes clear that the suspension, tolling, extension, or other relief provided by an order is effective as a matter of law in *every* case within the scope of the order in the jurisdiction upon the authorized judicial official's issuance of the order in compliance with the Act. Therefore, the effectiveness of an order in a particular case does not depend on the State alleging and proving the order.

Garrison contends that not requiring the State to plead and prove reliance on orders entered under the Judicial Emergency Act hinders defendants from having adequate notice of the State's reliance on such orders in preparing a defense. But this contention misses key points. There is no need for notice in this context because

the issuance of such an order is a fact of which the court can take judicial notice. In the context of tolling exceptions under OCGA §§ 17-3-2 to 17-3-2.2, questions of fact exist for the jury to determine. There, the State must allege its reliance on a tolling exception so that the defendant can timely prepare a defense — and the defendant's ability to mount a defense is a meaningful one, as it is the State's burden to prove to the jury that the exception applies. In contrast, the issuance of an order in compliance with the Judicial Emergency Act is a fact of which courts can take judicial notice, so there is nothing for the State to prove in this context.[21] Put another way, there is no factual defense that a defendant can mount against the application of a valid order that, unlike tolling exceptions under OCGA §§ 17-3-2 to 17-3-2.2 which can turn on factual predicates, is rather made effective as a matter of law upon an official issuing that order in compliance with the Judicial Emergency Act. There is no question of fact in this context, and so there is no need for the State

---

[21] We note that the date of the crime and the date that the prosecution commenced were both included in the amended accusation in this case.

to allege and prove such an order to prolong the limitations period.

Moreover, if a defendant is unsure about the basis on which the State commences a prosecution seemingly outside of the limitations period, nothing prevents that defendant from challenging that accusation by a special demurrer, general demurrer, or plea in bar, as Garrison did in this case. See, e.g., *Rivera*, 317 Ga. at 405-406 (1) (a). If the State relies on a tolling exception under OCGA §§ 17-3-2 to 17-3-2.2 without alleging that exception in the accusation, the State's failure to do so would render that accusation fatally defective as a matter of law, consistent with our precedent. If, instead, the State relies on relief provided by orders under the Act, such a point could be made in response to a special demurrer.

Garrison also contends that not requiring the State to plead and prove reliance on orders entered under the Judicial Emergency Act opens the door for widespread abuse by the State. But this contention ignores safeguards provided by the Judicial Emergency Act itself: only an authorized judicial official, as defined by the Act, can issue such orders; the authorized judicial official can do so only

28

for serious emergencies as specified by the Act; the scope of that authorized judicial official's authority upon the occurrence of those circumstances is further limited by that Act; the Act establishes notice requirements that operate as a prerequisite for any order to become effective; and the Act provides an avenue of appeal for any "person whose rights or interests are adversely affected" by any order (or subsequent modification or extension of that order). OCGA § 38-3-64. Further, if "the General Assembly wishes to impose" more stringent requirements on the State in order to rely on orders issued under the Judicial Emergency Act, it could do so by expressly imposing those requirements in that Act. See generally *In the Interest of M. D. H.*, 300 Ga. 46, 57 (6) (793 SE2d 49) (2016); *Staley v. State*, 284 Ga. 873, 874 (1) (672 SE2d 615) (2009) (separation of powers mandates that "statutory construction belongs to the courts, legislation to the legislature" (citation and punctuation omitted)).

Accordingly, because the issuance of an order in compliance with the Act renders the order effective in every case, because the text of that Act does not impose notice requirements as a

29

prerequisite for the State to rely on such orders, and because there is no factual defense that a defendant can mount against the application of a valid order, the State need not allege or prove the application of such orders in order to rely on them to prolong the limitations period.

3. *The proper standard for admission of HGN evidence has not yet been applied.*

Garrison contends that the Court of Appeals erred by failing to apply OCGA § 24-7-702 in determining whether the trial court abused its discretion in admitting the HGN evidence and that this was harmful error.[22] We agree that the Court of Appeals so erred. Because this error was not harmless, we vacate that court's judgment and remand the case for the trial court to determine under the proper standard whether Trooper McSweeny's testimony was properly admitted.

(a) *Garrison preserved this issue for ordinary appellate review.*

_____

[22] The Court of Appeals held that it found "no error" as to the admission of this evidence, but a trial court's evidentiary rulings are generally reviewed under the abuse of discretion standard. See *Jones v. State*, 305 Ga. 653, 655 (2) (827 SE2d 254) (2019).

To begin, despite the State's contention that Garrison's "vague and general objection" failed to preserve this issue for ordinary appellate review, Garrison preserved this issue. She timely objected when the State offered the challenged evidence, stated the specific ground for her objection, and received a definitive ruling admitting that evidence on the record. See OCGA § 24-1-103 (a) (1) (if a party challenges the admission of evidence, "stating the specific ground of objection," and the court makes a definitive ruling on the record, the claim of error is preserved for appeal); *Rashad v. State*, 318 Ga. 199, 209 (3) (a) (897 SE2d 760) (2024). Moreover, given the timing of Garrison's objection at trial and Garrison's clarification — "Just to preserve the record, that would be a *Daubert* challenge" — the trial court had sufficient context to understand the basis of Garrison's objection when making its ruling.[23]

(b) *The Court of Appeals erred by failing to consider this issue under the proper standard as set forth in OCGA § 24-7-702.*

---

[23] To the extent the State's argument could be understood as criticizing Garrison for a lack of specificity as to the nature of her *Daubert* objection, her lack of more detail is reasonable under the circumstances, given that the trial court overruled her objection mid-sentence.

Having preserved this issue for ordinary appellate review, Garrison argues that HGN evidence is scientific in nature and that Trooper McSweeny's contested conclusion was based on more than his perceptions "as an investigating officer and necessarily involve[d] the application of technical or other specialized knowledge." *Miller v. Golden Peanut Company*, 317 Ga. 22, 27 (1) (a) (891 SE2d 776) (2023) (citing OCGA § 24-7-702). Accordingly, Garrison contends, the State was required to satisfy the prerequisites associated with expert witness testimony under OCGA § 24-7-702, which, she argues, is a more stringent standard than the former standard set forth in *Harper* and applied here in admitting the HGN testimony.[24]

In affirming the trial court's admission of this testimony, the Court of Appeals relied on four cases that either applied *Harper* or

[24] We appear not yet to have expressly analyzed the extent to which the *Daubert* standard and the former *Harper* standard differ. But see Ronald L. Carlson & Michael Scott Carlson, Carlson on Evidence 416, 441 (9th ed. 2024) (characterizing *Harper* standard as "more liberal" than *Daubert*). We make no detailed holding on that important question today, other than to clarify that they are not the same.

32

failed altogether to consider the proposed expert's qualifications. See

*Spencer v. State*, 302 Ga. 133, 136 (805 SE2d 886) (2017); *Duncan v. State*, 305 Ga. App. 268, 270-271 (2) (699 SE2d 341) (2010); *Hawkins v. State*, 223 Ga. App. 34, 38 (1) (476 SE2d 803) (1996); *Cherry v. State*, 345 Ga. App. 409, 412 (2) (813 SE2d 408) (2018). This reliance was misplaced because those cases preceded the 2022 legislative amendment to OCGA § 24-7-702. With that amendment, which became effective on July 1, 2022, the General Assembly extended "to criminal cases the federal standard of admissibility of expert testimony articulated in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (113 SCt 2786, 125 LE2d 469) (1993), and its progeny. See Ga. L. 2022, p. 201, § 1 (amending OCGA § 24-7-702)." *Smith v. State*, 315 Ga. 287, 300 (2) (b) n.6 (882 SE2d 300) (2022); see also Ga. L. 2022, p. 201, § 3 (noting effective date).[25] As a result, "the

---

[25] The *Daubert* standard directs a trial court to assess the "reliability of the expert's proffered testimony[,]" considering "whether a theory or technique can be tested, whether it has been subjected to peer review and publication, the known or potential rate of error for the theory or technique, the general degree of acceptance in the relevant scientific or professional community, and the expert's range of experience and training." *Smith v. State*, 315 Ga. 287, 300 (2) (b) n.6 (882 SE2d 300) (2022).

33

*Harper* standard does not apply to cases tried after July 1, 2022."

*Nundra v. State*, 316 Ga. 1, 15 (5) (b) n.5 (885 SE2d 790) (2023); see also *Smith*, 315 Ga. at 300 (2) (b) n.6. Therefore, as Garrison's trial occurred in August 2022, both the trial court and the Court of Appeals erred by failing to consider this issue under the appropriate standard.

(c) *The failure to apply the correct standard requires us to vacate and remand.*

It is well settled that "[e]rroneous evidentiary rulings are subject to a harmless error test." *Allen v. State*, 310 Ga. 411, 415 (2) (851 SE2d 541) (2020). "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict[,]" and in this analysis, "we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done instead of viewing it in the light most favorable to the jury's verdict." *Jivens v. State*, 317 Ga. 859, 863 (2) (896 SE2d 516) (2023) (citations and punctuation omitted).

The State offers essentially two kinds of arguments as to how

34

the application of the wrong standard by the Court of Appeals does not require reversal. First, the State argues that an application of the correct standard shows that the evidence was admissible. Second, the State argues that even if the evidence was inadmissible, it is highly probable that it did not contribute to the verdict. In this procedural posture, we cannot agree on either point.

(i) *We cannot conclude on this record that the proper analysis would have resulted in a determination that the challenged evidence was admissible.*

In determining the admissibility of expert testimony under the *Daubert* standard, "the trial court acts as a gatekeeper, assessing both the witness' qualifications to testify in a particular area of expertise and the relevancy and reliability of the proffered testimony." *HNTB Georgia, Inc. v. Hamilton-King*, 287 Ga. 641, 642 (1) (697 SE2d 770) (2010). And the trial court examines reliability "through a consideration of many factors, including whether a theory or technique can be tested, whether it has been subjected to peer review and publication, the known or potential rate of error for the theory or technique, the general degree of acceptance in the

35

relevant scientific or professional community, and the expert's range of experience and training." Id. In comparison, the *Harper* standard directed the trial court to assess instead "whether the procedure or technique in question ha[d] reached a scientific stage of verifiable certainty, or [as one professor put it], whether the procedure 'rest[ed] upon the laws of nature.'" *Harper*, 249 Ga. at 525 (1).

Here, more than two years before the General Assembly amended OCGA § 24-7-702 to apply the *Daubert* standard in criminal cases, Garrison filed a motion in limine on September 4, 2019, seeking to exclude testimony related to the HGN test. At the time Garrison filed this motion, *Harper* was the binding test to determine the admissibility of the HGN-related testimony, and binding case law applying that standard made clear it was admissible. See, e.g., *Walsh v. State*, 303 Ga. 276, 283-284 (811 SE2d 353) (2018) (HGN test and procedures reached scientific state of verifiable certainty under *Harper* such that trial court could take judicial notice of their reliability). But the error asserted in this appeal arises not from the pre-trial motion in limine, but from

36

Garrison's objection made at trial, in August 2022. In that objection, Garrison contended that the testimony was inadmissible under the *Daubert* standard. *Daubert* had become applicable in criminal cases scarcely one month earlier.

Accordingly, when Garrison objected on *Daubert* grounds, the trial court should have considered Trooper McSweeny's qualifications to testify as to the HGN test as well as the relevance and reliability of the proffered testimony based on the *Daubert* standard, including the reliability factors listed above. But no such consideration is apparent from the record; rather, the trial court overruled Garrison's objection before Garrison's attorney had finished the sentence containing the objection. The State made no proffer as to the reliability of HGN testing in the context of this case, much less any of the specific reliability factors. As such, the record before us does not appear to contain evidence from which the trial court could have found, or from which we could determine in the first instance, that Trooper McSweeny's testimony about the HGN test satisfied the *Daubert* standard.

This is not to say that Trooper McSweeny's HGN-related testimony could not satisfy the *Daubert* standard. Rather, the record before us is too scant for the trial court to have made that determination. And the record before us is too scant for us to make that determination for the first time on appeal. This is especially so given that no reported Georgia decision has ever considered the reliability of HGN-related evidence under the *Daubert* standard. As a "court of review," see Ga. Const. of 1983, Art. VI, Sec. VI, Par. II, we decline to do so in the first instance. Therefore, we cannot conclude on this record that the proper analysis would have resulted in a determination that the challenged evidence was admissible.

(ii) *We cannot conclude on this record that it is highly probable that the challenged evidence did not contribute to the verdict.*

The State contends that any error in admitting the challenged evidence was harmless because evidence of Garrison's guilt was overwhelming and "the HGN test was but a small portion of the evidence in favor of the jury's verdict." We disagree.

To begin, evidence of Garrison's impairment was

circumstantial and far from overwhelming. No one testified that they observed the accident take place, and testimony based on interactions with Garrison before and after the accident do not provide substantial evidence of impairment.

A hairdressing client who had an appointment less than two hours before the single-vehicle accident testified that he did not notice any odor of alcohol or drug impairment during his "uneventful" hair appointment, which lasted 20-to-30 minutes.

Similarly, three of the four eyewitnesses who observed the aftermath of the accident did not observe anything that would give them the impression that Garrison was under the influence of alcohol or drugs. The man who called 911 testified that he "didn't get close enough" to observe anything unusual about the driver or to form an opinion as to whether she was impaired. Deputy Mann, the first responding officer, did not remember an odor of alcohol or have any reason to say that Garrison was under the influence of alcohol or drugs. Lt. Brackett testified that he did not remember whether he smelled alcohol and, in a video recording from the scene of the

accident that was played for the jury, stated "I can't smell no alcohol." Moreover, Trooper McSweeny, the only other eyewitness observing the aftermath of the accident, testified that he did not smell alcohol initially and, when he did notice it, he described the smell as merely a "slight odor of alcoholic beverage[.]"

In other cases where any evidentiary error was found to be harmless, courts have considered among other things whether the defendant's eyes were red or watery, speech was slurred or incoherent, and movements were sluggish and stumbling.[26] See *State v. Robertson*, 369 Ga. App. 707, 712-713 (1) (894 SE2d 431) (2023); *Smith v. State*, 338 Ga. App. 635, 641 (5) (791 SE2d 418) (2016); *Yarber v. State*, 337 Ga. App. 40, 45 (785 SE2d 677) (2016). But here, no witness testified as to the presence of these traits, and Garrison did not appear to exhibit these characteristics in the nearly 30-minute dash camera video recording, which was played for the

---

[26] This is not to say that this list of considerations is all-encompassing or that each of these considerations must be present for evidence of impairment to be overwhelming. Rather, we set out these considerations because they are relevant in determining whether, taking the evidence as a whole, any error in admitting the HGN testimony was harmless.

jury. Rather, that video recording revealed that Garrison answered each of Trooper McSweeny's questions, volunteered that hours before the accident she had taken prescription medicine that was prescribed to her, showed Trooper McSweeny that prescription bottle, and seemed to have control of her balance apart from her demonstration to Trooper McSweeny that she had a knee issue that could cause her to "lose balance on this knee if [she] tried to hold it up[.]"

The State points to evidence that Garrison was argumentative and emotional in resisting arrest, that Garrison lied initially about her consumption of alcohol the night before, and that there were two incidents of less safe driving — the failure to secure the truck at a gas station and the single-vehicle accident — to support its contention that any error was harmless. But the State points to no evidence other than the HGN test to support that this evidence was related to Garrison's impairment as opposed to some other reason, such as Garrison's explanation that she was distracted because she had "a lot on her plate." Put simply, the non-HGN impairment

evidence that the State depends on is not strong enough to render the HGN evidence harmless.

This is especially so because Trooper McSweeny's testimony about Garrison's performance on the HGN test was the strongest piece of evidence regarding impairment. That test was the only test performed. In explaining his rationale for not performing the walk and turn and one-leg test on cross-examination, Trooper McSweeny testified among other things that he need not perform those tests because "with an HGN alone, it has proven to be the most scientific of all of the evaluations put together." This explanation occurred after the jury heard Trooper McSweeny testify as to his training and experience with the HGN test, how based on his experience he had "noticed a correlation between alcohol impairment and nystagmus[,]" and that the HGN test was "considered to be the most scientifically proven" and "reliable" test. Trooper McSweeny also opined that what he had observed "was the same thing that [he had] always observed even in training and other cases where there were clues that led [him] to believe the person was impaired" and that

Garrison's performance on that test indicated "[i]mpairment. Driving under the influence." During closing argument, although the State directed the jury that the "biggest piece of evidence [the jury was] going to have in this case was the truck[,]" the State also directed the jury to Trooper McSweeny's testimony as evidence of Garrison's impairment — "he did a scientific test to determine if she was impaired. That's what he told you. That test is used to determine if someone is impaired." The record makes clear that the State heavily relied on the HGN testimony as evidence of Garrison's impairment.

Under these circumstances, where the evidence of Garrison's impairment was not overwhelming and the strongest evidence of impairment was Trooper McSweeny's testimony about the HGN test, the State failed to satisfy its burden of proving that the error did not contribute to the jury's verdict. Compare *Hamilton v. State*, 309 Ga. 1, 10-11 (3) (843 SE2d 840) (2020) (any error in admitting testimony was harmless when that testimony was cumulative of other admitted evidence); *Jones v. State*, 301 Ga. 544, 550-551 (3)

43

(802 SE2d 234) (2017) (erroneous admission of evidence was harmless where direct evidence of appellant's guilt was overwhelming).

Therefore, because we cannot say that the application of the wrong standard was harmless, the proper course under this Court's precedents for similar errors is to vacate the trial court's judgment and remand the case for the trial court to exercise its discretion to determine under the correct standard, as set forth in OCGA § 24-7-702, whether the HGN testimony was properly admitted. See, e.g., *Butler v. State*, 309 Ga. 755, 763-764 (2) (d) (848 SE2d 97) (2020); *Rouzan v. State*, 308 Ga. 894, 901 (2) (843 SE2d 814) (2020). If the trial court decides under the correct standard that this testimony was properly admitted, the trial court should re-enter the judgments of conviction and sentences against Garrison, and Garrison could then take another appeal challenging that ruling. See *Butler*, 309 Ga. at 763-764 (2); *Rouzan*, 308 Ga. at 901 (2). If, on the other hand, the trial court decides that the testimony should have been excluded, then a new trial will be necessary. See *Butler*, 309 Ga. at 763-764

(2); *Rouzan*, 308 Ga. at 901 (2).

*Judgment vacated and case remanded. All the Justices concur.*

Decided August 13, 2024 — Reconsideration denied September 17, 2024.

Certiorari to the Court of Appeals of Georgia — 368 Ga. App. 819.

*McDonald & Cody, Samuel J. Sliger; Willis Law Firm, Greg A. Willis, Jessica Jones*, for appellant.

*W. Jeffrey Langley, District Attorney, Daniel S. Garrett, Assistant District Attorney*, for appellee.

*Ashleigh B. Merchant, Hunter J. Rodgers*, amici curiae.